## VILLA *v.* RODRIGUEZ.

1. A deed, absolute on its face, made by nephews and nieces, with their mother, to an uncle—a debt to the uncle from them being at the time of the deed secured by mortgage on part of the premises—held to be but a mortgage; this against a lessee of the grantee, with a right of purchase, who had made large expenditures on the land, in apparent expectation of purchase; in the face, too, of some proof that the deed was meant to make an absolute transfer, with a view to sale, leaving a trust upon the *proceeds* of the sale above the amount of the original mortgage debt.

2. A vendee cannot defend as a *bonâ fide* purchaser without notice, against an unrecorded mortgage, where his rights lie in an executory contract; nor where he has a right to call for no deed but that of a "quit-claim."

ERROR to the Circuit Court for the District of California; the case being thus:

George Alexander filed a bill in the court below against Jacinto Rodriguez and George Steele with three others, his brothers, to redeem a ranch of land near San Luis Obispo, in California, known as the Rancho Corral de Piedra, from an instrument which he averred to be a mortgage upon the land; an instrument whose history was much disputed, but which seemed essentially thus:

In 1852, José Maria Villavicencia, called for brevity Villa, being owner of the ranch in question, having at the time seven children, to wit, five sons and two daughters—most of the children being yet minors—conveyed it to them. He died in the following year, leaving these children and their mother, his wife, surviving him. The mother, with these children, lived upon the ranch, and having her brother, Jacinto Rodriguez, an active business man, "of superior intelligence," living in the city of Monterey. The widow was extremely poor, and her children were reared as laborers. She could write her name, but not much more. Two of her daughters, at a later date, got to be educated, and one, at least, of the sons. Before December, 1860, she became involved in debt and borrowed money of her brother Jacinto, for which she and three of her children (four others being still minors, and one other being absent), gave him, on the

4th December, of the same year just named, a mortgage for $4000, bearing 24 *per cent. per year* interest, for 5 years, and providing that the same should be *compounded every six months;* and in case he should sue upon it, he should *also be allowed counsel fees* at 5 per cent.; and should he pay taxes on the land, all amounts so paid should bear the same interest, and become a part of the mortgage debt; all payable, according to the California usage, in gold coin. On the 13th November, 1862, Rodriguez paid an additional sum of $1172, to redeem the land from a tax sale, which the widow's failure to pay the taxes on it had brought about.

In the winter of 1863–4, no rain fell in California, and a drought so severe was the consequence, that the crops failed and the cattle starved. The people were suffering and disheartened. Property could not be sold. The cattle of this family perished during this season, and they had nothing laid by, nor any property except a few horses. In this state of things, Rodriguez called upon his sister and her children. His visit, as stated in his own words, was under the following circumstances:

"I had a mortgage on the ranch. I remarked to my sister that it was time to settle our business, because the mortgage could not last a lifetime. She told me to come whenever I pleased to make a settlement. I went subsequently to her house, and told her and several of the children that I had come for the settlement of our affairs. Then she and the rest of the family—for they were all there except one, who was not in the country at the time—said that they had consulted together and had determined to *sell* me the ranch; to convey it to me on account of the money in the mortgage which they owed me. They told me they had determined to do that, because, if I put it up for sale, some other person would certainly buy it, and then they would never get it; and that they preferred that I should finally be the owner, because I was the one who had saved them on a former occasion, when they were about to lose the ranch on another mortgage. Then I told them, 'If you are all agreed to convey to me your rights, I will accept your proposition with great pleasure, and will take no steps to sell the ranch.' They told me, 'Yes,' that they were determined to do

that, and that they did it with great pleasure. Then I told them, 'It is well, but here is a thing I have to say to you: there is Antonio (this was the youngest son), who is not yet of age; if, when he comes of age, he makes a conveyance to somebody else, that will give me some trouble.' He said that I might confide in him; that he would do nothing of the kind, that he had been benefited by the use of these moneys as well as the rest of the family. I said, 'It is very well if that is so; I trust to you.' Then I said, 'Very well, I shall cause the conveyance to be drawn up in order to close the mortgage. I shall bring the recorder here,' &c., and the whole family told me go and get the *titulo* made out, and that they would be sure and comply with what they had said."

At this time, as the reader will have noted, Rodriguez had his money secured on only three-sevenths of the property.

By the laws of California, mortgaged land and the mortgage on it both pay taxes. In this case, therefore, Rodriguez was paying taxes on his mortgage and the land was also paying taxes. Accordingly, among the motives which he gave for his wanting a deed was this one:

"When I came and settled my affairs with my sister, I said that it did not suit me to pay taxes twice. If they did not pay the taxes on the ranch, I had to pay them."

Accordingly, on the 29th April, 1864—three years and five months after the mortgage had been given having passed—and the original debt of $4000, with the $1172 paid in 1862 to redeem the land from the tax sale, amounting now, at the rates of interest fixed, to about $10,000—all the children except the one who was "not in the country at the time"—including the youngest, the "Antonio" above referred to and not yet of age—conveyed the ranch by a deed on its face absolute, to Rodriguez. *The consideration expressed in the deed was the discharge of the grantees from all debt and the cancellation of the mortgage then held by the grantee.* The mortgage, which secured the greater part of this debt, was immediately discharged on the county records. Antonio, the minor child, conveyed anew, when coming of age, February 17th, 1865. The other child, who had been out of the

country when the already-mentioned deed was made by the widow and other children, conveyed May 20th of the year above stated. The consideration paid to this last was $100 in gold.

Rodriguez being now thus vested with the shares of the widow and whole seven children, on the 22d July, 1866, demised the ranch by a "lease and agreement of sale" to George Steele and the three others, his brothers, for five years, from the 1st August, 1866, with a right of purchase by them at the end of the term, or within five days afterwards, for $25,000, gold; and he covenanted " that he would, by a sufficient deed, *release and quit-claim* to the lessees or their heirs and assigns, free from all incumbrances created by him, *all right and title* which he *then* had to the premises, or which he *might thereafter acquire* from the United States, or from any of the heirs of José Maria Villavicencia."

The Villa family were informed of this lease in a general way, both before and after its execution.

Under this contract the Steeles went into possession of the property, began the construction of improvements, stocked the land with cattle, and established dairies. The Villa family remained on the ranch in the old ranch house, with certain lands around it, which gave them the means of pasturing their horses. The males of the family were employed by the Steeles in hauling timber, in fencing the land, and in building houses of the Steeles, and generally in the construction of the improvements to be made under the covenants of the lease.

About this time the Villa family were advised by some persons more educated than themselves, that the deed made to their uncle, if attacked in law, might be set aside and they become again possessed of the ranch (now grown very valuable), subject to paying the money advanced by their uncle. Accordingly, five of the children, and the widow, conveyed to a sixth one (Fulgencio), without valuable consideration, all their right in the ranch. At this time Fulgencio was in the employ of the Steeles; but substituting one of his brothers in his place, he left them, proceeded to

San Francisco, and on the 26th day of December, 1867, executed to one George Alexander a deed conveying all his right, title, and interest in the said lands. The consideration, as set forth in the deed, was $35,000. But the real money consideration paid was $1000, with a promise that, should Alexander succeed in recovering the premises, the family should receive $35,000 and a conveyance of 350 acres of land, including the ranch house. Alexander, being thus vested with a paper-title to six-sevenths of the land, filed the bill below against Rodriguez and the Steeles, to be declared owner of that portion of the land, subject to the debt which first rested on it.

The bill set forth that the Villa family being poor, and both they and Rodriguez, desirous of avoiding the payment of taxes upon land and mortgage both, had an account concerning the moneys due upon the mortgage, and for the money advanced to effect the redemption from the tax sale; that there was found to be due upon the mortgage, for principal and interest, $8610, and for the moneys advanced to effect the redemption, $1172, with interest from November 12th, 1862, and that it was then agreed, in order to avoid the payment of taxes, both upon the lands and mortgage, that the widow and children should convey the lands to Rodriguez, by deed of conveyance purporting to convey the same in fee, but that such deed should in fact be, and was intended to be a mortgage upon three-sevenths, for the security and payment of the debt of $8610, and upon five-sevenths for the repayment of the $1172, and interest, as aforesaid; and that the mortgagors should have the right to redeem the lands upon the repayment of the said several sums, and interest thereon; that the grantors accordingly remained in possession of the premises, described, as owners; that the deed was, at the time of its execution, intended by all the parties to be, and was, in fact, a mortgage to secure the payment of the two above-named sums, respectively, and that the same was true of the conveyances subsequently made by the two other children.

The bill set forth further, that the Steeles, in 1866, had

taken possession of all the lands so granted, except an adobe dwelling-house, situated on them, and about fifty acres of land surrounding it, and had since then continued, and now were in possession of the same, and had used and occupied the same for agricultural and dairy purposes; that the value of this use and occupation had been, and was $3500 a year, and that upon a fair settlement of the rents and profits, nothing would be found to be due Rodriguez, either upon the mortgage debt, or upon the other sum advanced, or otherwise.

Rodriguez and the Steeles answering, denied that the deeds were intended to be a security, and alleged that the transaction was a *bonâ fide* sale for full value; that the widow and children had been in possession only of a small part (twelve acres), and of this but as tenants of Rodriguez; that the use and occupation of the whole tract—it being a wilderness—was not worth more than $100, except in virtue of great outlays by the Steeles, $14,000 at least; and that with these, it did not exceed $500 a year; that the rent of $3500, agreed on, had been punctually paid to Rodriguez; that the widow and children had seen the Steeles put into possession, and the improvements made without any objection; conversing with the Steeles daily, and the Villa children working for them on and about the very premises; and that the Steeles were to be regarded purchasers *bonâ fide*, without notice.

The evidence (which included Rodriguez's account of the matters already given) consisted, with that of others persons, of the testimony of one Charles Dana, the county clerk, who went with Rodriguez to take an acknowledgment of the deed by the widow and the five children. Dana said:

"In the course of a conversation, which was wholly unsolicited, Mr. Rodriguez stated to me, *that his object in getting the family to execute the deed was to secure his money, and save the property for the benefit of his sister and her family*, while if it remained in their hands he might lose his money, and his sister and her children would lose the whole property. He said they had done wisely in trusting to him, as he intended to deal justly

by his sister. He mentioned also by their so doing, he would avoid paying taxes on the mortgage, while as it then stood, they paid on the premises and he on the mortgage. Then he generally mentioned that they would not have cause to regret the steps they had taken. That he would save the property for them, and save himself at the same time. There was a short conversation between Rodriguez and Mrs. Villa, in my presence, and that of the rest of the grantors. Mrs. Villa asked Rodriguez whether the instrument was in strict accordance with the private conversation which had taken place between them, and the agreements which they had made. He answered that it was in accordance with all the agreements and understandings which had been had between the two. Then Mr. Rodriguez requested me to read the deed, which I did. Mrs. Villa, when the reading was over, stated that it did not mention any of the agreements they had made. Rodriguez, to the best of my recollection, stated that it did; that they ought not to distrust him, as he was taking all these steps for their interest. Thereupon they executed the deed, and I took their acknowledgments. At the time when the deed was executed, I observed that the family were not very willing to sign the deed unless under the agreements and conversations which had taken place between them and Mr. Rodriguez, and then the remarks which I have said, I distinctly recollect, were made."

The widow, herself, said:

"The agreement that we made with my brother, when he obtained the signatures, was that it was to be a security for his money. With this understanding, I informed my children of the conversation that took place with my brother. He told me not to distrust him."

The son, Antonio, said:

"My mother stated that my uncle said he would take no advantage of us, but wanted merely to get his money, and that we should not distrust him."

Another one of the children:

"I signed the paper because my uncle came to the ranch and had a talk with my mother, and requested her that she should speak to us, that we might sign."

A third and fourth, with four other witnesses—ten in all—supported this account of the transaction.   One of the witnesses, named Cappe—a letter, however, of whom to Rodriguez, treating him as being so far absolute owner as to be able to dispose of the property, was produced—said:

"Mr. Rodriguez came from Monterey, and came to see me, and said he wanted to know what lawyer he could employ to make some papers.   I told him Mr. Van Ness.   Then we went to see Van Ness next day.   He told me that he wanted to have a deed made from his sister and all her children, to secure him for his debt which they owed to him, because he was paying taxes for the property and the mortgage, being, both the property and the mortgage, the same thing, and he paying the taxes twice, and by having a deed made to him, the boys would not be in debt any more."

So this Van Ness, who, however, had drawn the deeds for an absolute conveyance, and had been for two years trying to purchase the land from Rodriguez:

"Mr. Rodriguez had said to me and written to me several times, that his object was to save the valuable portion of the property for his sister and her children, and that if he could dispose of two leagues lying back towards the mountain, that sum would cancel his debt, and leave all that the family would require."

To return to the statement of Rodriguez himself.   He said:

"I told them, 'I don't wish to speculate upon you, because you are my relations, and you have treated me well; and if I can sell this ranch for enough to reimburse myself for my outlays, as well as interest, *I will return you the surplus money, if any;* and, also, if I can sell a portion of the ranch, or enough to reimburse myself for my advance, I will do the same, and return to you the unsold portion of the ranch; but if I cannot sell it, I will lose the money.'"

Rodriguez himself asserted in the most positive manner that the instrument was not meant to be a mortgage of the land itself, but was meant to put the title completely in him.

He acknowledged that he had promised to return the surplus. His testimony ran thus:

*Question.* Was there any agreement between you, that the deed should be a mortgage?

*Answer.* No, sir; as far as the mortgage was concerned, *I had one already.* I wanted the title of ownership.

*Question.* Did you say anything in that conversation to Mr. Dana about giving the surplus to the family?

*Answer.* I stated at the ranch, and again stated to my sister, *afterwards,* that I would return the surplus money; but it was no *obligation* of mine. It may be that I said so to Charles Dana *at the time.* I told him I was much pleased with having settled my business, and also with being *the owner of that ranch;* that if I had not interfered with that business they would have been deprived of this ranch many a year ago.

Pedro Rodriguez, a brother of Jacinto, testified:

"In 1864, towards the end of May, my sister told me she had sold the ranch to Jacinto. They were all present except José and Fulgencio. During the whole time they expressed that they sold it with *great pleasure.* In 1864, my sister told me she wanted to look her a house somewhere in San Luis Obispo, to dwell in, so that whenever Jacinto should require the ranch, she could be ready to leave there with the same *pleasure* that she had took in selling the ranch."

Desidero Rodriguez, also a brother, testified that his sister told him of having sold the ranch to Jacinto:

"She stated to me that she lived on the ranch through the favor of my brother, and that whenever he had any use for it she would leave the same; quit the house on it *with much pleasure,* and go and live even under a tree."

José Rodriguez, a third brother, stated that he had heard a conversation between the family two or three days before the deed was made, and that they all said that they were going to convey their rights to Jacinto; that they *did so with much pleasure;* and that after the execution, he heard them all say, that they were living on the ranch "with his per-

mission; that at any hour, whether in the daytime or at night, they had to quit it."

The actual quantity of land conveyed was 20,135 acres. Its value in 1864, when the deed was made, was perhaps $20,000, and in 1866, when leased to the Steeles, hardly less than $30,000.

By a statute of California, "to regulate the interest of money," passed March 13th, 1850,* it is thus enacted:

"3856. § 1. Where there is no express contract in writing, fixing a different rate of interest, interest shall be allowed at rate of 10 per cent. per annum, for all moneys after they become due on any bond, bill, promissory note or other instrument of writing.

"3857. § 2. Parties may agree in writing for the payment of any rate of interest whatever, on money due or to become due on any contract.

"3858. § 3. The parties may, in any contract in writing, whereby any debt is secured to be paid, agree that if the interest on such debt is not punctually paid it shall become a part of the principal, and thereafter bear the same rate of interest as the principal debt."

The conclusion of the court below, from all the evidence in the case, was that the deed and the testimony of Rodriguez disclosed the true nature of the transaction, viz., that the land was conveyed not in security for, but in satisfaction and extinguishment of the precedent debt; but under the expectation, founded on Rodriguez's assurances, that any surplus of the price at which it might be sold over and above the amount necessary to reimburse Rodriguez, would be by the latter appropriated to the benefit of the family.

Whatever trust, therefore, was created, referred itself, according to this view, to the proceeds, and did not attach itself to the land or in any way impair the right of Rodriguez to dispose of it.

A decree being made accordingly Alexander appealed to this court.

---

* 1 General Laws of California, 559.

*Messrs. M. Blair and F. A. Dick, for the appellant:*

The evidence is overwhelming to show that the parties regarded the deed as a continued security for the debt, and that the expectation was that Rodriguez would treat the land as a security and not as his absolute property. To what else than making the transfer a mortgage could the private conversations and understandings, spoken of by Dana, refer to? But whether the instrument was in fact meant as a mortgage equity will, under circumstances like the present, intervene and make it so. It is the case of a sharp, intelligent, trading city brother, dealing with a poor and uneducated widowed sister and his young nephews and nieces, on a farm as yet a wilderness,—his debtors, his supposed beneficiaries,—in a short, cruel way, unknown even to a money-lender.

The principles laid down in *Morris* v. *Nixon,*[*] in this court—a leading case, but less strong than ours is—that where confidential relations exist between a debtor and creditor, and a conveyance is made by the debtor to the creditor, it will be treated as a mortgage, if the consideration of the deed is the debt, and this is the construction in equity of such a transaction. The rule does but iterate what the Leading Cases in Equity declare to be a well-settled rule of equity.[†]

*Messrs. Brent and Crittenden, contra:*

The question is not whether the instrument is a mortgage or not; but conceding that it is a mortgage, the question is *of what* is it a mortgage? The decree below declares that the deed was a transfer with power to sell, a deed, with a view to a claim on the surplus of proceeds when the tract should be sold; in other words, that it was a mortgage on *proceeds*, and not a mortgage on the land as a thing. *We* have not appealed. It is the other side who appeals; seeking to reverse the decree below, and to have the mortgage declared to have been one on the land as a *res;* and not on it as a source of money

---

[*] 1 Howard, 118; and see Russell *v.* Southard, 12 Id. 139; and Wharf *v* Howell, 5 Binney, 499

[†] Vol. 2, p. 644.

by sale. That the view taken by the court below was a
true view of the nature of the deed; that the "private con-
versations," "agreements, and understandings" between
Rodriguez and his sister, were to *this* effect, and not to the
making of the instrument a mortgage on the land as a thing,
all the testimony shows. The view of the court below is
consistent with almost all the testimony, and is the only
view that is. It is entirely consistent even with the testi-
mony of Dana, relied on as conclusive to show a mortgage
of the *res;* and consistent with what the counsel of the other
side assert that the testimony is overwhelming to show;
namely, "that the parties regarded the deed as a continued
security for the debt, and that the expectation was, that Rod-
riguez would treat the land as a security, and not as his *abso-
lute* property." The question, here and now, we repeat, is not
whether there was a mortgage, but *on what* the mortgage was;
on land or the proceeds of land? If the view taken by the
court below be not absolutely consistent with the testimony
of some of the Villas, it is to be remembered that these per-
sons testify under the pressure of great interest, and under
the greatest temptation, so to shape their testimony, as to
get the $35,000 dependent on success. What a lure in such
a case to perjury. The view which would look on the matter
in the way that we here—on this appeal—contend for, looks
on a natural and a fair arrangement. The debt to Rodriguez
was a real one; he had advanced his money, gold coin, of
course. Monstrous on the Atlantic coast, the rate of interest
was not unusual in California, where a frightful taxation
on the *mortgage,* as well as a less one on the land, reduced
the net interest to reasonable sums. Rodriguez was in trade.
He had need of his money. Perhaps he had himself bor-
rowed it, and if he borrowed he probably borrowed at the
rates that he lent. *He* had redeemed the land. He says:
"Convey the property to me. I sponge your debt. We will
avoid double taxes. I will sell the land and repay myself;
and if I sell for more than you owe me, you shall have the
surplus; if I cannot sell it, I will lose the money." What
was there unconscionable in this? It was a family trans-

action, to be sure; and with needy relatives. But can a man have nothing to do with needy relatives, under penalty of being regarded in everything that he does do, as a robber? If he cannot *give* them money, is he to let them perish because he cannot lend it to them? because any arrangements, however advantageous then, will not stand, if afterwards—in years, and by accidents which could not have been foreseen—the property rises in value, and others, strangers, not he, grow rich? The property had to be sold. The Villas could not pay the taxes. Rodriguez had redeemed once, and now was paying double taxes. Who better could sell to advantage than he? And could he not better sell with a title in his own name, than agent of a widow and parcel of children; some liable to marry, die and leave minors, or otherwise embarrass the title? Could he have sued any of the Villas after this transfer for the money lent or advanced to them? No one will assert that he could. If he could not, the transaction was not a mortgage, though it may well be a transfer with a power to sell, leaving a trust on surplus proceeds.

So far as Rodriguez is concerned, it is the same thing whether the instrument is declared a mortgage or an absolute conveyance with a claim on surplus proceeds. But to the Steeles, the difference is enormous. A mortgage takes all their immense improvements. Now the reason why a lease with a right to purchase in fee was made, instead of a conveyance in fee and a mortgage, is sufficiently inferable from what is shown as to the laws of California. It was to avoid double taxation on the same property. The transaction was quite lawful. But if the Steeles are not *bonâ fide* purchasers without notice—which we might assert that they were—certainly they have great equities; equities almost equal to that class of persons. Their vendor came to them with a perfect paper title. No mortgage was on record. They were suffered to take possession without a word of protest, or any intimation of the rights now set up. They were permitted to make the valuable improvements under the eyes of the Villas, the real complainants here. Several

of the sons entered into their employ, and a lease was finally procured from them for the house and grounds the family were occupying. For more than a year the rights now set up, if suspected to exist, were entirely concealed.

The appellant was the purchaser of a litigious claim. He paid a mere nominal consideration in cash, and offered to ignorant and illiterate witnesses, the strongest temptation to fraud and perjury. He should not be favored in a court of equity.*

*Reply:* The Steeles were speculators, not purchasers in any sense; certainly not purchasers *without notice.* For they held under an executory contract,† and could ask at best for but a quit-claim deed.‡

Mr. Justice SWAYNE delivered the opinion of the court.

This is an appeal in equity from the decree of the Circuit Court of the United States for the District of California. The appellant was the complainant in the court below. The decree was against him.

He seeks to redeem the premises in controversy according to the prayer of his bill. The defendant, Rodriguez, claims an indefeasible estate in them as regards the complainant and those from whom he derives title. The other defendants claim under a contract of purchase made with Rodriguez. The validity of the complainant's title, if his grantor had anything to convey, is not questioned. Nor is the original title of his grantor and of those who conveyed to him denied. But the defendants insist that the title of all those parties was vested absolutely in Rodriguez by deeds duly made and recorded before the conveyances to the complainant and his grantor were executed. The complainant insists that Rodriguez, after, as before, the legal title was conveyed to him, held the premises only as security for a debt. This is the hinge of the controversy between the parties.

---

* Orton *v.* Smith, 18 Howard, 264–5.

† 2 Leading Cases in Equity, 96.

‡ May *v.* Le Claire, 11 Wallace, 217.

The entire, tract, of which the premises in controversy form a part, was conveyed by José Maria Villavicencia on the 13th of April, 1852, to his seven children. He died in 1853. The widow and five of the children conveyed to Fulgencio, also one of the children, on the 16th of December, 1867. On the 26th of the same month Fulgencio conveyed to the complainant. By virtue of this conveyance he claims six-sevenths of the tract. That proportion is his if his title be valid.

The widow is the sister of the defendant, Rodriguez. On the 4th of December, 1860, she and three of the children, the other four being under age, executed to Rodriguez, for money then borrowed, a note for four thousand dollars, payable a year from date, and bearing interest at the rate of two per cent. a month, payable at the end of each six months thereafter; the interest, " if not so paid, to be added to the principal and draw interest at the same rate, compounding in the same manner." A mortgage upon the entire tract was given at the same time by the makers of the note to secure its payment. The mortgage contained a provision, that in default of the payment of the interest as stipulated, the principal should become due and payable at the option of the mortgagee, and that the mortgage might thereupon be foreclosed and the premises sold to satisfy the mortgage debt, and that out of the proceeds of the sale the mortgagee should be authorized to retain, besides his debt and costs, a counsel fee of five per cent. upon the amount found to be due. The mortgage contained a further provision that the mortgagee might pay all taxes and incumbrances on the property, and that the amount of such advances should be secured by the mortgage, and should also bear interest at the rate of two per cent. per month. Rodriguez subsequently paid $1172 to redeem the property from a sale for taxes. On the 29th of April, 1864, the widow and five of the children conveyed to him by a deed absolute in form. It is recited in the deed that the debt secured by the mortgage then amounted to about $10,000. On the 17th of February, 1865, one of the children, who was a minor when this

deed was executed, and hence had not joined in it, also conveyed to Rodriguez. Nothing was paid to the grantor. On the 20th of May, 1865, the other and seventh child, who had then become of age, executed a like conveyance. The consideration paid was $100.

On the 22d of July, 1866, Rodriguez demised the premises so conveyed to him to his co-defendants, Edgar W., Isaac C., and Rensselaer E. Steele. The defendant, George Steele, subsequently became interested in this contract by an arrangement with the lessees. The leasehold term was for five years from the 1st of August, ensuing its date. Rodriguez stipulated that at the end of the term or within five days thereafter the lessees might purchase by paying him $25,000 in gold, and upon such payment being so made he covenanted that he would, by a sufficient deed, release and quit-claim to the lessees or their heirs and assigns, free from all incumbrances created by him, all the right and title which he then had to the premises or which he might thereafter acquire from the United States or from any of the heirs of José Maria Villavicencia.

The lessees and their assignees insist that they are *bonâ fide* purchasers without notice.

This proposition cannot be maintained. The contract gave them the option—it did not bind them—to buy at the time specified. That time had not arrived when this bill was filed. *Non constat* that they would then exercise their election affirmatively and pay the stipulated price. But this point is not material. The doctrine invoked has no application where the rights of the vendee lie in an executory contract. It applies only where the legal title has been conveyed and the purchase-money fully paid.* The purchaser then holds adversely to all the world, and may disclaim even the title of his vendor.†

This contract calls for a quit-claim deed. The result would be the same if such a deed had been executed and full pay-

---

\* Nace *v.* Boyer, 30 Pennsylvania, 110; Boone *v.* Chiles, 10 Peters, 177, 211.

† Croxall *v.* Shererd, 5 Wallace, 289.

ment·made, without notice of the adverse claim. Such a purchaser cannot have the immunity which the principle sought to be applied gives to those entitled to its protection.* This ·contract may, therefore, be laid out of view. It is no impediment to the assertion of the complainant's rights, whatever they may be. It does not in any wise affect them.

The law upon the subject of the right to redeem where the mortgagor has conveyed to the mortgagee the equity of redemption, is well settled. It is characterized by a jealous and salutary policy. Principles almost as stern are applied as those which govern where a sale by a *cestui que trust* to his trustee is drawn in· question. To give validity to such a sale by a mortgagor it must be shown that the conduct of the mortgagee was, in all things, fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him. Where· confidential relations and the means of oppression exist, the scrutiny is severer than in cases of. a different· character. The form of the instruments employed is immaterial. That the mortgagor knowingly surrendered and never intended to reclaim is of no consequence. If there is vice in the transaction the law, while it will secure to the mortgagee his debt, with interest, will compel him~to give back that which he has taken with unclean hands. Public policy, sound morals, and the protection due to those whose property is thus involved, require that such should be the law.†

The terms exacted for the loan by Rodriguez were harsh and oppressive. The condition of the widow and orphans

---

* May *v.* Le Claire, 11 Id. 232; Oliver *v.* Piatt, 3 Howard, 363.

† Morris *v.* Nixon, 1 Howard, 118; Russell *v.* Southard, 12 Id. 139; Wakeman *v.* Hazleton, 3 Barbour's Chancery, 148; 4 Kent's Commentaries, 143; Holmes *v.* Grant, 8 Paige, 245; 3 Leading Cases in Equity, 625.

might well have touched his kindred heart with sympathy. It seems only to have whetted his avarice. Two per cent. a month—and this, if not paid as stipulated, to be compounded —was a devouring rate of interest. It was stipulated that the further advances should bear interest at the same rate. He demanded an adjustment when, from the failure of the crops and other causes, the property was greatly depressed, and he knew the widow and her children had no means of payment. The alternatives presented were an absolute conveyance of the property or a foreclosure and sale under the mortgage. He was anxious to procure the deed, and exulted when he got it. The debt and advances, with the interest superadded, were much less than the value of the property. The note and mortgage were executed by three of the children and the widow—the deed by the widow and five of the children. The other two children conveyed at later periods. The consideration of the conveyance by the four children not parties to the note and mortgage was such that if an absolute title passed, their deeds must be regarded as deeds of gift of their shares of a valuable estate. Dana, who took the acknowledgment of the deed executed by the widow and five children, testifies that the widow inquired whether the deed contained all the agreements between her and Rodriguez. Dana translated it to her. She complained that the agreements were omitted. Rodriguez insisted that they were in the deed, and added " that they ought not to distrust him, as he was taking all these steps for their interest." The widow and children then executed the deed. Dana, speaking of a subsequent conversation with Rodriguez, on the same day, " which was altogether unsolicited," says: " he stated to me that his object in getting the Villavicencia family to execute the deed aforesaid was to secure his money, money which he had loaned or advanced to them, and save the property for the benefit of his sister and her family, while if it remained in their hands he might lose his money, and his sister and her children would lose the whole property. He said they had done wisely in trusting him, as he intended to deal justly by his sister." Rodriguez was exam-

ined as a witness. Referring to a period shortly preceding the execution of this deed, he says: "Afterwards I had with them further conversation, and told them, I don't wish to speculate upon you, because you are my relations; and you have treated me well. If I can sell the ranch for enough to reimburse myself for my outlays as well as interest, I will return you the surplus money, if any; and, also, if I can sell a portion of the ranch, or enough to reimburse myself for my advance, I will do the same, and return to you the unsold portion of the ranch, but if I have bad luck and cannot sell it, I will lose my money." Elsewhere, in the same deposition, he says: "I stated at the ranch, and again stated to my sister afterwards, that I would return the surplus money, but it was no obligation of mine. It may be that I said so to Charles Dana at that time."

He made the same admissions to other persons who are in no wise connected with this litigation. Their testimony is found in the record. It is unnecessary to extend the limits of this opinion by accumulating and commenting upon it. The widow and five of the children, all who have been examined, testify that they understood the deeds to be only security for the debt. This explains the transaction as to those who were not parties to the note and mortgage. There is no other way of accounting for their conduct. The testimony of Rodriguez alone is sufficient to turn the scale against him. He cannot repudiate the assurances upon which his grantors were drawn in to convey. To permit him to do so would give triumph to iniquity. The facts indisputably established bring the case clearly within those principles by the light of which, in determining the rights of the parties, the judgment of this court must be made up. The complainant stands in the place of those from whom he derives title. He is clothed with their rights, and is entitled to redeem six-sevenths of the premises upon paying that proportion of the mortgage debt and interest. The former must be held to include the amount advanced, as well as that represented by the note, and the latter be settled by the terms of the contract and the law of California. The

rents, issues, and profits, and improvements made upon the premises must also be taken into the account.

THE DECREE IS REVERSED, and the cause will be remanded to the Circuit Court with directions to enter a decree and proceed

               IN CONFORMITY TO THIS OPINION.