Mr. Justice MacArthur
delivered the opinion of the court:
The first question to be determined is whether the two instruments in writing, executed and delivered by the complainant to the defendant, operate as a security for the payment *20 of the $2,000, or as an absolute conveyance of the property. The complainant offers parol testimony for the purpose of showing that the deeds, although absolute on their face, were really intended as a security for money loaned. The rale admitting such evidence for this purpose is now well settled, and was not questioned on the hearing of this case. The evidence upon the subject consists of the pleadings, the deeds, and the testimony of one or two witnesses. The instruments are absolute on their face, and are both in the record, and are in support of the case set up by the defendant. The allegations in the bill, that they were intended only as a mortgage, are positively denied in the answer. The only witnesses, except the complainant himself, who testify to anything from which the court can infer, at the time of the second instrument, the transaction was a loan, are George Simms and Margaret, his wife, who. both state that Davis said that Peugh owed him $2,000, loaned on the squares. They are, however, contradicted by Joseph H. Hilton, who was present at the same interview, and who testifies that no such statement was made. Bichard A. Hill says he knew the parties, and that in the fall of 1862, at the corner of Fourteenth street and Pennsylvania avenue, he heard Davis hail Peugh about a $2,000 loan, and that he said to Peugh he had promised two and a half per cent, interest per month thereon, and that if Peugh would pay that interest he would give Peugh a deed in fee. There is no other fact or circumstance in the case going to show that the last instrument was effected upon any arrangement that it could be a mortgage. »
William H. Ward, who was a witness for defendant, states that the instrument is in his handwriting, and that the parties came to his office, and that he drew said paper at their joint direction, and that the transaction was a final sale of the property; and he directly contradicts every allegation in the bill material to the plaintiff’s case, and supports the defendant’s answer on that subject. Mr. Ward is a conveyancer-and a member of the bar, and with opportunities of knowledge, by information from both parties, as to the nature of the transaction at the time it occurred.. He prepared the instrument under their immediatedirection, and embodied in it their agreement. He states that he informed them that, as *21 a deed had already been made of the property, this would be the best way'to convert what had previously been a mortgage into an absolute purchase. And he is corroborated by the receipt which Peugh then gave the defendant, expressed to be for the purchase of the squares.
We think that against a case like this a statement which might bear a different construction, made in a conversation at a corner of a street and, perhaps, not well remembered, cannot prevail, and we are quite clearly of the opinion that it was the understanding of the parties that the deed of February 9,1858, should operate as an absolute sale, and that complainant’s equity of redemption should thereby be extinguished.
The complainant seeks also to invoke to his aid the principle by which courts of equity will regard any agreement between mortgagor and mortgagee for the absolute sale of the land. In Villa vs. Rodriguez, 12 Wall., 323, the Supreme Court enforced this principle in the following language :
“ The law upon the subject of the right to redeem, where the mortgagor has conveyed to the mortgagee the equity of redemption, is well settled. It is characterized by a jealous and salutary policy. Principles almost as stern are applied as those which govern where a sale by a oestui qui trust to his trustee is drawn in question. To give validity to such a sale by a mortgagor, it must be shown that the conduct of the mortgagee was, in all things, fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him. When confidential relations and the means of oppression exist, the scrutiny is severer than in cases of a different character. The form of the instruments employed is immaterial. That the mortgagor knowingly surrendered and never intended to reclaim is of no consequence. If there is vice in the transaction, the law, while it will secure to the mortgagee his debt, with interest, will compel him to give back that which he has taken with unclean hands. Public policy, sound morals, and the protection due to those whose property is involved require that such be the law.”
*22 These observations were made in a case where the deed was made by nieces and nephews of the mortgagee, who was their uncle, and by their mother, who was his sister, and a widow. There had also been agreements which the mortgagee had omitted in the deed, and which he falsely affirmed were in the deed. The deed was in a language which the widow could not read, and it was translated to her by the person who took the acknowledgment, and who testified that Eodriguez, the mortgagee, informed him at the time that he only wanted to secure his advances, and that he would return the surplus money to the widow and her children. Indeed, the evidence was overwhelming to show that the deed was to be regarded as a security for the indebtedness, and the strong expressions of the court were amply justified by the oppressive and unconscionable conduct of the creditor. In the present case there is no allegation in the bill that the instrument was procured by fraud or undue influence, and no constraint is alleged to have been used by the defendant. The needy circumstances of complainant are shown, but that is an incident to the condition of almost all men who have to borrow money. There is no ground, therefore, shown in the bill which would authorize the court to scrutinize the transaction as in a case where fraud is charged, or relief asked from an unconscientious advantage obtained by the defendant, for which the purchase should be set aside. There is no suggestion even in the bill that the defendant did not pay the value of the property; it only alleges that it is now worth about $30,000. But the bill was filed after the lapse of eleven years from the time of the transaction, and we all know that the value of real estate has realized a very great appreciation from the wonderful growth of the city.
In the case of Russell vs. Southard, 12 How., 155, Mr. Justice Curtis, who delivered the opinion of the court, has collected the authorities regarding the law where a mortgagee in possession takes a release of the equity of redemption, and he concludes by observing: “But we are unwilling to lay down a rule which would be likely to prevent any prudent mortgagee in possession, however fair his intention may be, from purchasing the property, by making the validity of the •purchase depend on his ability afterwards to show that he paid for the property all that any one would have been will *23 ing to give. We do not deem it fit, for the benefit of mortgagors, that such a rule should exist.”
Much of the testimony in the depositions has reference to the value of the property in question during the years 1857 and 1858, and if it were necessary to examine it for the purpose of determining the adequacy of price for the purchase made by the defendant, it would be difficult to say that Davis did not pay a sufficient consideration for the surrender of the equity.
The land was purchased in 1845 by the complainant for two cents per square foot. In 1858, when Davis procured the full title, the complainant’s witnesses testify real estate had risen in value, and the defendant’s witnesses are equally positive that it had declined by reason of the monetary crisis of that period, which prostrated the values and business of the whole country. Sales were few and always on credit, and these squares were unimproved, and probably had only a •speculative value at that time; so that, if we were called upon to consider the testimony on this point, we cannot say that the validity of the purchase can be effected by anything connected with the consideration.
Suits in ejectment upon tax-titles were pending which, if successful, would not only have cut off the equity of redemption, but destroyed the lien of the defendant. Other taxes were unpaid; all this was known by the parties, and the con-, tract was made with reference to these encumbrances. The condition and value of the property was undoubtedly affected in the mind of the defendant by these circumstances; and it would indeed be hard, if not impossible, to say at this distance of time, in view of all the circumstances, that the amount paid was not an adequate consideration. We apprehend it would be a dangerous precedent to hold otherwise at this late day.
The intemperate expressions of defendant toward Peugh, preceding the execution of the bond, certainly exhibit acerbity of temper, but they do not seem to have influenced the conduct of the parties in the slightest decree.
A majority of the court are of opinion that the decree below ought to be affirmed.
Oartter, Ch. J., and Mr. Justice Wylie dissenting.