## No. 13,455.

TAYLOR ET AL. *v.* BRIGGS, ADMINISTRATOR, ET AL.

(60 P. [2d] 1081)

Decided June 29, 1936. Rehearing denied September 28, 1936.

90

Mr. Floyd E. Pendell, Mr. Warwick M. Downing, for plaintiffs in error.

Mr. Edgar McComb, Mr. Milton D. Green, Messrs. Alter & Upton, on petition for rehearing, for defendants in error.

*En Banc.*

Mr. Justice Hilliard delivered the opinion of the court.

A suit filed June 1, 1931, by Taylor and wife to have an instrument, absolute in terms, under which Briggs and Land Investment Company claim to hold, adjudged to be a mortgage, with privilege to redeem. Lefferdink holds an interest dependent on title of Briggs and the land company. Continental Oil Company holds an oil lease under Briggs and land company, cancellation of which the Taylors prayed, but during trial it was agreed that the lease should be recognized and follow the title. Redman, public trustee, has no interest. Judgment of dismissal of the Taylor complaint entered. We refer to plaintiffs in error as Taylor and defendants in error as Briggs.

The parties are Briggs, an experienced and extensive money lender on farm security, and Taylor, a trusting and industrious farmer. Late in 1920, after an interview with Briggs and learning from him that he had a first deed of trust of $2,500, and of the existence of a second trust deed

of $1,400, on the land in controversy, Taylor purchased the equity for $2,000, making payment in liberty bonds. Briggs advised Taylor of the then owners' default in interest on his loan and payment of taxes. Taylor relied wholly on Briggs as to title and liens, important as indicating his confidence in Briggs' fairness then and consistent with his continued dependence thereon.

After purchase Taylor made improvements on the place and invested in equipment and livestock reasonably required in the conduct thereof, all at an additional outlay of $2,500. It is unquestioned that in an earnest endeavor to wring a living from parched, hail and drought stricken land, and secure a sufficient income to discharge interest and tax obligations, both Taylor and his wife worked long hours and hard, she frequently doing the work of a man. Through it all Briggs was sympathetic, encouraged Taylor to persevere and was lenient in his exactions. In this, as clearly appears, Briggs was pursuing not only what may be said to be a considerate course toward the hapless farmer-debtor, but one consistent with business judgment as well, for he knew that Taylor, of proven industry and honor, was his chief reliance in the matter of realizing on the loan, and that the only alternative was to procure through foreclosure title to land then practically marketless—a situation which Briggs always decried.

The crop failures of 1921 and 1922 so reduced Taylor's resources that he had to seek employment for hire that his family might exist, and he came to Denver and served as a tramway conductor. Throughout 1921 and 1922, when he farmed the land, and 1923, when he worked in Denver, Taylor and Briggs kept in friendly business communication, and from time to time Taylor paid something on the Briggs claim—seemingly to the extent that Briggs credited him with doing his utmost in that regard. The sum of the payments Taylor made, as stated by Briggs, was $545, itemized by him as follows: 1921, January 10, $100; February 4, $100; March 4, $50; March 22, $50; April 11, $50; May 14, $50; 1922, March 11, $100; 1923,

February 3, $15; March 15, $15; April 30, $15. Taylor claimed to have paid some $630, but the difference is important to no issue in the case. It is mentioned to free Taylor from the imputation of indifference to his obligations.

In September, 1923, the Briggs trust deed matured, and in January, 1924, Taylor and Briggs then, as theretofore and thereafter, enjoying friendly business relations, discussed foreclosure and the effect it would have on Taylor and the second mortgage. Briggs said foreclosure would clear up the subsequent mortgage for Taylor's "benefit as well as my own." Remarking on the situation at the conclusion of the trial, the court said: "That there had been a foreclosure and agreement to permit redemption after the statutory period had expired, and that was carried forward something over a year after the statutory redemption time had expired. There is no indication, that I can find, that Mr. Briggs tried to take advantage of his foreclosure agreement." The court further said: "There is no question here of the substance and the reality of the transactions between Mr. and Mrs. Taylor and Mr. Briggs, I don't care what you call it, a mortgage, or option, or a right to redeem." The evidence clearly disclosed, to which the quoted remarks of the court lend emphasis, that as between Briggs and Taylor the foreclosure was a friendly proceeding, calculated on the part of Briggs to eliminate the Simonson mortgage, upon which Taylor was not personally liable, so that Taylor—not previously so obligated—would be encouraged to undertake to pay Briggs the principal of his mortgage, interest, taxes and expense of foreclosure, which, as often said by him, was "all he wanted;" and to that end their minds met. Simultaneously, and as a detail of the new agreement, Taylor made Briggs a down payment of $2,000, evidenced by a promissory note, secured by chattel mortgage due May 24, 1925, the date it was expected trustee's deed pursuant to foreclosure would issue to Briggs. At the same time

Briggs took an oil lease from Taylor on the land, to run for five years.

It appears, regardless of what had gone before, that in January, 1924, Taylor became definitely indebted to Briggs in the aggregate of principal, interest, advanced taxes and expense of agreed foreclosure, growing out of Briggs' first deed, in an amount shown to be $4,379.93, to secure payment of which Briggs took title to the land involved pursuant to foreclosure. In short, the transaction was intended by the parties as a security. There is further correspondence, occurring subsequent to completed foreclosure, or shortly before, consistent only with the theory that Taylor was Briggs' debtor as the result of the agreement of January, 1924, for which Briggs was secured by his foreclosure deed, with chattel security in addition as to $2,000 of the agreed sum. We quote from some of the letters: March 13, 1924, Briggs wrote Taylor, saying: "Kindly let me hear from you as to how things look in the neighborhood and if you have moved to the ranch. Prospects should be pretty good as we are having so much snow." April 21, 1924, Taylor who had returned to the ranch, wrote to Briggs: "Your letter and foreclosure notice at hand. Everything is fine and I am glad you are clearing up the title as it looks pretty good here now. A large crew of men are working right here on the structure. Have been here nearly a month. I regret that we failed to pay the taxes, but am putting out 50 acres of beans, and crop prospects are good. I will insure them so have hope of making a little cash by this fall. Trust that you will not be over bid on the place, and take it that I have nothing to fear on May 5." April 25, 1924, Briggs to Taylor: "I am in receipt of your letter of the 21st inst. and was glad to hear from you. Put in every acre you possibly can on this place as it looks like this is going to be a good crop year. I am glad to hear they are prospecting for oil and I hope that our one-half section will come within the boundaries of the structure. I have commenced foreclosure proceedings and will close out all

subsequent liens and anyone calling on you relative to this place in any particular may be referred to me. Please keep me posted from time to time of the oil developments in that locality. When your crop is all in and things looking good, I wish you would let me know as I would like to come up and go over the place with you. I have a number of other places to look at in and around that county." November 20, 1924, Briggs to Taylor: "Have you marketed any crops and when can I expect a remittance? Are you planning to farm the place for another year? Please let me hear from you right away." May 4, 1925, Taylor to Briggs: "Referring to your letter just at hand in regard to Mr. Behring wishing to rent part of the west half of 13-6-61 wish to say it seems from your letter there seems to be some misunderstanding in regard to the title to this land. Of course we understand fully you have lawful title to same through the courts which becomes final almost immediately, but we were given to understand this was only a matter of form and in accordance with such an understanding gave you a $2000.00 chattel mortgage due in March, 1926, to protect you on account of taxes, interest, fees & so forth, and therefore theoretically, we remain in full possession and could do with as regards crops and so forth as we wished without any accounting to you or anyone else. We do not understand you collecting any rent from this land and still hold the mortgage against us. Of course in regard to rent from Mr. Behring or some one like that we can see why you would consider it no more than reasonable that the rent should be paid to you but not necessarily. And as for you having our chattels heavily encumbered to protect you and then to be also bound by a lease seems to be entirely too much. We would appreciate knowing just what your understanding is of this matter." May 6, 1925, Briggs to Taylor: "I am in receipt of your letter of May 4th. I have closed out this piece of land and have the title; also have a chattel mortgage from you on your personal property in accordance to the plan as outlined in your letter. You can make a

deal with me to redeem this property in accordance with our understanding, and I have not attempted to do anything at any time other than to protect your interest as well as my own along the lines we talked, and after I wrote you and you told me that you could not farm but a small portion of it and Mr. Behring phoned me and said he would be able to farm the whole thing, I thought it would be a great deal better to have the property rented and in crops than to lie idle as the proceeds from the rents could be applied upon the purchase price which naturally would be yours by such an arrangement. I have a letter from Mr. Behring this morning copy of which I herewith enclose. It seems to me that it would be a good business arrangement for you to see him and let him farm all of the ground that you are not going to farm unless it is your intention to put it all in crops. I cannot see why you would have any objection to renting that part of the place that you are not going to farm and the proceeds of the rents be applied upon the purchase price as well as any chattels that may be sold which are covered by the mortgage which I hold. You understand that I have been put to considerable expense by foreclosure proceedings through the courts and have had to pay the taxes and the procedure which I went through has cut off something like $2500 of subsequent indebtedness against the place which you will get the benefit of should you redeem. It is my firm opinion that it is your duty to work with me in order to get the best results out of this property. These are hard times and naturally we can do more by co-operation than otherwise.''

There was correspondence as to varying sums which Taylor suggested paying toward his obligation, and Briggs' willingness to accept, and, although the payments were not in fact made, the letters unmistakably pointed to the relationship of debtor and creditor, growing out of the January, 1924, foreclosure arrangement. There was evidence, some of it appearing from correspondence, that Taylor believed he could get the money from home

folks in West Virginia, but Briggs insisted on having an interest in the oil rights, etc., which Taylor said operated against his efforts to obtain the money as well as being contrary to the agreement on which foreclosure had proceeded. And so the matter rested until May 29, 1926, when Briggs wrote the following letter to Taylor, to which Taylor made no response. "Inasmuch as you have not made a payment for the option to purchase the land and wrote me under date of February 24, 1926, saying that you were intending to drop the matter, I am enclosing herein your chattel mortgage and note together with release. While I could take possesion of these chattels covered by the mortgage and sell them, I do not feel disposed to do so and I am calling it off as you have never paid any interest or any part of the principal. If at some future date you should desire to purchase this land, I would be glad to make you an attractive price on it provided I have not sold it in the meantime." Briggs letter was falsely premised, for Taylor had not written February 24, 1926, or at any time, so far as appears, that he was "intending to drop the matter," as stated by Briggs, but rather that he had decided "to let the matter rest as it is until he carries on a little correspondence with his folks." Briggs' immediate reply, February 26, 1926, imported a very different understanding of Taylor's letter than that stated in his letter of May 29, 1926, for in his earlier letter he said: "I notice that you have decided to drop the purchase of the land until you hear from your folks. This might be a good plan to see whether they would like to take on the deal as we talked." In any event, if any doubt existed up to that time as to whether the transaction had "resolved itself into a security," as the books say, Briggs' May 29, 1926, letter made it clear. For, after disposing of Taylor and his interest in the property to his own liking, Briggs added that "I could take possession of these chattels covered by the mortgage and sell them." On no hypothesis other than Taylor's indebtedness to him could he have sold the chattels, and there is no

basis for Taylor's indebtedness save that growing out of the January, 1924, agreement.

The correspondence further shows that after foreclosure Briggs urged Taylor, who had farmed the land in 1924 and 1925, to allow one Behring to farm it (if Taylor did not wish to do so himself), the rentals to go to Briggs to be credited on Taylor's indebtedness, to which Taylor agreed. The evidence shows that Behring paid Briggs rental as follows: 1926, $229.50; 1927, $211; 1928, $60.94; 1929, $112; 1930, $120. In addition to the acknowledgment of Taylor's possession and right of control of the property after foreclosure, which Briggs' conduct in this instance recognized, he neglected to give Taylor credit for the Behring payments. The final correspondence between the parties occurred in December, 1930, although there was conversation relative to the matter between 1926 and that time. December 1, 1930, Taylor wrote Briggs as follows: "Would appreciate hearing from you regarding our rights to the W ½ s 13 6 T 61 Weld Co. We feel that it is time to straighten this matter out and would like to have your final word in the matter." December 8, 1930, Briggs replied: "In answer to your letter of December 1, 1930, in regards to the W ½ of Section 13, Tp. 6 N., 61 West, Weld County. This is to inform you that you have no claim, right, title, or interest whatsoever in or to the above described lands or property." March 5, 1931, Briggs gave the oil lease referred to, but when thereafter oil was discovered does not appear. It does appear, however, that Briggs was paid $25,000 when he signed the lease, and that at the time of the trial the lessee had developed such production that the royalty reserved in the lease amounted to $12,915.45.

That the transaction between Briggs and Taylor out of which the former obtained title to the land in question resulted in a security, is well premised, for notwithstanding the absolute character of Briggs' title paper, it is in effect a mortgage. It became so, not because fraud or mistake entered into its execution, allegation or proof

98

of neither being necessary, or because its terms were permitted to be varied, but because by competent evidence, oral and otherwise, "an equity superior to its terms" was established. Denison Code Pleading, §§708-711; *Pierce v. Robinson*, 13 Cal. 116; *Ver Straten v. Worth*, 79 Colo. 30, 243 Pac. 1104. "A mortgage is but a lien," says Judge Denison, the foreclosure of which is, "controlled by the code." The learned former chief justice of this court cited section 281, Code of Civil Procedure, 1921, which reads: "A mortgage of real property shall not be deemed a conveyance, whatever its terms, so as to enable the owner of the mortgage to recover possession of the real property without foreclosure and sale, and the fact of a deed being a mortgage in effect, may be proved by oral testimony; but this section shall not apply to trust deeds with power of sale." Also, section 12, chapter 150, Session Laws 1927, reading: "Mortgages, trust deeds or other instruments intended to secure the payment of an obligation affecting title to or an interest in real property, shall not be deemed a conveyance, regardless of its terms, so as to enable the owner of the obligation secured to recover possession of real property without foreclosure and sale, but the same shall be deemed a lien." See *Wilson v. Giem*, 90 Colo. 27, 5 P. (2d) 880; *Ver Straten v. Worth, supra;* Jones on Mortgages (8th Ed.) 435, §348. The rule is not different because the instrument by which Briggs claims came through formal foreclosure of a former mortgage lien. *Heron v. Weston*, 44 Colo. 379, 100 Pac. 1130; *Reitze v. Humphreys,* 53 Colo. 177, 125 Pac. 518; *Thacker v. Morris,* 52 W. Va. 220. It is the spirit of the original transaction as of the time thereof, not the form of the body, however and whenever appearing, that enables the court to perceive and moves it to declare the refinements of justice. See *Reitze v. Humphreys, supra; Blackstock v. Robertson,* 42 Colo. 472, 94 Pac. 336; *Borcherdt v. Favor,* 16 Colo. App. 406, 66 Pac. 251.

"The character of the transaction is fixed at its inception and is what the intention of the parties makes

it. The form of the transaction and the circumstances attending it are the means of finding out the intention. If it was a mortgage in the beginning it remains so, in accordance with the maxim 'once a mortgage always a mortgage.' " 1 Jones on Mortgages (8th Ed.) 380, 381, §314. See, also, *Goodbar & Co. v. Bloom,* 43 Tex. Civ. App. 434, 98 S. W. 657; *Marshall v. Russell,* 61 Colo. 417, 158 Pac. 141; *Rees v. Rhodes,* 3 Ariz. 235, 73 Pac. 446. "It is a settled rule and practice of courts of equity to set aside a formal deed, and allow the grantor to redeem upon proof, even by parol evidence, that the conveyance was not a sale, but merely a security for a debt, and therefore a mortgage." 1 Jones on Mortgages (8th Ed.) 425, §340. *Wilson v. Giem, supra.* If the instrument by which the mortgagee holds is adjudged to be a mortgage, whatever its terms, and however established, it cannot "thereafter become anything else except through the execution of a subsequent agreement, based upon a valuable consideration." *Marshall v. Russell, supra.* "If the transaction between the parties was intended as security for a debt, it was in law a mortgage, * * *" and the "mortgagee, even though the mortgagor was in default, * * * had no right to the possession of the premises until after foreclosure and sale." *Morris v. Cheney,* 81 Colo. 393, 255 Pac. 987. Code section 281 is cited in the opinion.

In a case where a deed absolute on its face was found to be a mortgage, and the amount due the grantee was $2,300, while the property was valued at from $6,000 to $7,500, we said, "Value is one test to show the character of the transaction." *Wilson v. Giem, supra.* Here, we should not overlook the fact that while the whole of Briggs' claim was less than $5,000, he was given a down payment of $25,000 for a lease on the land involved, and his reserved royalty on production was in excess of $12,000 at the time of trial. The record shows that Briggs was constantly alert as to the oil potentialities of the property, and throughout the negotiations for payment by Taylor, partial or in full, Briggs insisted on having an interest in

the oil, which Taylor as often denied. It is clear that Briggs knew when to cease demanding payment and arbitrarily dispose of Taylor's recognized equity. In addition to the fact that he was not at liberty thus to deal with his helpless debtor, he did not invoke the sole remedy open to him—foreclosure. *Fairview Mining Corporation v. American Mines and Smelting Co.*, 86 Colo. 77, 278 Pac. 800. ''Lenders of money being less under the pressure of circumstances which control the perfect and free exercise of the judgment than borrowers, the effort is frequently made by that class of persons to avail themselves of the advantage of this superiority, in order to obtain inequitable bargains.'' *Baugher v. Merryman,* 32 Md. 185.

It is insisted that Briggs' letter of May 29, 1926 (which Taylor never answered in any manner) put an end to the relation of debtor and creditor which, since January, 1924, had undoubtedly obtained between Taylor and Briggs, and transformed that which until then had been a mortgage on Taylor's land into an instrument of unqualified conveyance unhampered with mortgage limitations. If the transaction of January, 1924, resulted in a mortgage lien, not open to question, as we think, Briggs' letter, as such, worked no change in the situation. But, say defendants in error, since Briggs returned with his letter Taylor's note for $2,000 and a chattel mortgage securing it, and thereafter Taylor sold some of the chattels, Briggs' foray was successful. The contention is untenable. First of all, Taylor's silence on receipt of Briggs' letter and thereafter did not conclude him. *Boone v. Drake,* 109 N. C. 79. Secondly, when Briggs returned the $2,000 note and chattel mortgage he only was surrendering that which was collateral to the main obligation and but part thereof, however regarded. As to the sale of some of the chattels, it was not immediate. In 1928, two years after Briggs' letter of 1926, Taylor held a sale preparatory to moving to another part of the state, and disposed of some of the livestock and part of the machinery covered by the Briggs' chattel mortgage. We cannot think, the circumstances

considered, that Taylor's sale of a few of the aging cows and horses and worn machinery, two years subsequent to Briggs' letter, so changed the equities otherwise obtaining as to work Taylor's complete undoing and Briggs' right to immediate ten fold realization of a $2,500 loan, plus potential additional thousands in royalties—$12,000 of such royalties having accumulated at the time of trial. Nothing so informal as Briggs' letter and what Taylor did some two years later can justify that result.

On the case generally, and as indicating the rules which govern courts of justice on application of debtors to be allowed to redeem, we quote from the opinion of Mr. Justice Swayne in *Villa v. Rodriguez,* 12 Wall. 323 (reported as *Alexander v. Rodriguez,* in 20 L. Ed. 406), as follows: "Principles almost as stern are applied as those which govern where a sale by a cestui que trust to his trustee is drawn in question. To give validity to such a sale by a mortgagor it must be shown that the conduct of the mortgagee was, in all things, fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him. Where confidential relations and the means of oppression exist, the scrutiny is severer than in cases of a different character. The form of the instruments employed is immaterial. That the mortgagor knowingly surrendered and never intended to reclaim is of no consequence. If there is vice in the transaction the law, while it will secure to the mortgagee his debt, with interest, will compel him to give back that which he has taken with unclean hands. Public policy, sound morals, and the protection due to those whose property is thus involved, require that such should be the law."

What we have said indicates our conclusion on the controlling issue. We have not failed to examine as to each of the defenses interposed and believe none has

merit. Perhaps we should emphasize that in the circumstances here, Taylor was not required to tender payment, *Reitze v. Humphreys, supra; Rees v. Rhodes, supra.*

Let the judgment be reversed, and subject to Briggs' right to have the principal and interest of his debt, taxes on the property paid by him, expense of foreclosure and other proper expenditures in the premises, which, as said in *Dougherty v. McColgan,* 6 Gill & John., 275, is "all that he is in justice entitled to, or ought to seek to attain," Taylor's right to redeem should be adjudged. The estate of Briggs and the land company should account for the moneys received from the Continental company, and in the sum it exceeds what is due from Taylor judgment should enter in the latter's favor. The Continental Oil Company should attorn to Taylor for impounded funds and royalties accrued and to accrue growing out of the lease it holds on the land involved. The trial court will proceed as advised to an accounting. Lefferdink should be adjudged to have no interest in the subject of the suit.

Mr. Justice Holland dissents.