## No. 14,372.

## Rocky Mountain Gold Mines, Inc. v. Gold, Silver and Tungsten, Inc.

(93 P. [2d] 973)

Decided June 26, 1939. Rehearing denied September 18, 1939.

Mr. Charles F. Brannan, Messrs. Ewing, Arnold & Weinberger, for plaintiff in error.

Mr. John T. Adams, for defendant in error.

*En Banc.*

Mr. Chief Justice Hilliard delivered the opinion of the court.

A complaint in ejectment. Plaintiff in error, defendant at trial, claiming as assignee of an instrument denominated a "mining lease and option" of the premises involved, which it pleaded in extenso, and in virtue whereof it was in possession, answered and sought relief as in equity. It set forth what it had paid and performed pursuant to the terms of the lease and option, and con-

tended the substantiality thereof evidenced its good faith, and worked such equity in its favor that defendant in error should be relegated to foreclosure. Consistently, plaintiff in error prayed for dismissal of the action, or, that only as in foreclosure, with right of redemption saved to plaintiff in error, should defendant in error enjoy fruits in the present proceeding. The case was tried as in chancery, but equitable relief was denied and ejectment adjudged. We quote the document:

Lease.

"This indenture, made and entered into this 22nd day of September A. D. 1934, by and between the Tungsten Production Company, Inc., a Colorado corporation, as party of the first part, and hereinafter termed the Lessor, and Scott Hendricks of the City of San Francisco, State of California, as party of the second part, and hereinafter termed the Lessee, Witnesseth:

"That for and in consideration of the sum of fifteen thousand dollars ($15,000.00) and royalties hereinafter reserved unto the Lessor, and of the covenants and agreements hereafter contained to be faithfully paid, kept and performed by the said Lessee, and subject to all of the terms, conditions and reservations herein set forth, the said Lessor has demised and let, and by these presents does lease, demise and let unto the said Lessee an undivided seven-eighths (⅞) of the certain lode mining claims, mill sites, property and rights, situate and being in Grand Island Mining District, County of Boulder and State of Colorado, described as follows, to-wit:

(Here follows description of mining claims and mill sites involved.)

"It is agreed that all improvements, machinery and equipment which shall be placed upon the demised premises during the term hereof shall be considered as belonging to the demised premises and upon the expiration or sooner termination of this lease shall become the property of said Lessor.

"To have and to hold the said demised premises and

property, subject to all of the terms, covenants and conditions herein set forth, for the sole purpose of mining and developing the same, for the term of thirty-eight months (38) from the date hereof, unless sooner forfeited or determined through the violation of any of the covenants, agreements or conditions hereinafter against the said Lessee reserved.

"In consideration of this demise and the rights and privileges herein and hereby granted, the said Lessee hereby covenants and agrees to and with the said Lessor as follows, to-wit:

"First: To commence work on the demised premises and the actual mining of the same within thirty days (30) after the date of the execution hereof, and to do all work and conduct all operations upon and within the demised premises in mine fashion, and in a thorough, skillful and workmanlike manner, and in accordance with good mining practice and methods, so as to take out the greatest amount of ore possible with due regard to the development, safety and preservation of the demised premises as a workable mine, and to the covenants and agreements herein contained; to at all times observe and comply with all laws and regulations of this State and of the United States which are now in force or which may be hereafter enacted. To pay the general taxes due and payable on January 1, 1935, and each year thereafter during the continuance of this lease.

"Second: To work and mine said premises as aforesaid steadily and continuously during the term hereof, performing not less than one hundred and fifty (150) underground shifts of work within the demised premises within each and every calendar month beginning thirty (30) days after the date of this agreement, and until the commencement of the operation of the mill as herein provided, and after the commencement of the operation of said mill, and during the remainder of the life of this agreement not less than three hundred (300) underground shifts within each and every calendar month, and any

excess above the required number of shifts that may be performed by the said Lessee within any one calendar month shall not apply on the succeeding or any following month or months of said term. The word 'shift' as herein used, shall mean the labor of one man for one day of at least eight hours.

"Third: To well and sufficiently timber all workings within the demised premises wherever necessary or proper in accordance with good mining practice, and to repair or replace all old timbering wherever and whenever it may become necessary or proper in accordance with good mining practice.

"Not to commit or permit the commission of any waste or damage within or upon the demised premises, and to at all times preserve and maintain said premises as a safe and workable mine.

"Fourth: To at all times keep the main tunnel and all other workings where operations are being conducted within the demised premises drained and clear of loose rock and rubbish and in a safe and secure condition, except only as prevented from so doing by act of God or unavoidable accident. To do no underhand stoping of any kind for any purpose and to store no waste underground, except for filling stopes where the ore has been extracted. In driving the main tunnel, the said Lessee agrees at all times to maintain the same on a uniform grade of four tenths of one per cent and to make and keep said tunnel not less than five feet wide by seven feet high in the clear above the tracks.

"Fifth: To reconstruct or revamp the mill situate on said property so that said mill shall have a capacity to adequately treat at least fifteen hundred (1500) tons of ore per month, and to start said mill operating on or before one hundred twenty (120) days after date of this agreement; except, however, that if said mill shall not be operating within said one hundred twenty (120) day period, this lease shall not be terminated if said Lessee shall pay to the Lessor the sum of twenty-five hundred

dollars ($2500.00) in cash on or before the termination of said one hundred twenty (120) days, whereupon the said Lessee shall have an additional thirty (30) days in which to commence the operation of said mill. Additional extensions, for periods of thirty (30) days each, shall, in like manner, be granted to the Lessee upon payment of twenty-five hundred ($2500.00) on or before the expiration of any such thirty (30) day period.

"Sixth: To ship all ores with due diligence after the same are mined or after the same are mined and milled. To occupy and hold any and all veins, cross or parallel lodes, spurs, feeders or mineral deposits of every kind which may be discovered in any manner by working within or upon the demised premises as part and parcel of the said demised premises, and as the property of the said Lessor with privilege to mine same under this lease.

"Seventh: To pay to the Lessor a royalty of 12½% of the net mill, smelter or sampler returns of all ores mined or extracted by the said Lessee from the demised premises, and a like royalty on the net mill, smelter or sampler returns of any and all mine dumps or mill tailings that have been or may be extracted from the demised premises and located and deposited thereon. For the purpose of fixing the compensation to be paid by said Lessee to the said Lessor for the use by said Lessee of the Boulder County Tunnel and/or mill and the other property hereby leased in the mining of outside ores from other properties not covered by this lease, a vertical plane shall be considered as extended downward through the west end line, as well as through the continuation in its own directions northerly and southerly of the west end line of the said Boulder County Lode No. 43, and it is agreed that said Lessee shall pay the said Lessor, as compensation for the use of the property hereby leased, 12½% of the net mill, smelter or sampler returns of all outside ores mined by Lessee east of said vertical plane and 6¼% of the net mill, smelter or sampler returns of all outside ores mined by said Lessee west of said vertical

plane. If the said Lessee shall sell any mill tailings or ores from any mine dumps which have been extracted from the demised properties but which have been or shall be deposited on outside ground, said Lessee shall pay to the said Lessor 6¼% of the net mill, smelter or sampler returns thereof. If the said Lessee shall mill any ores on the demised premises which have not been extracted therefrom or which have not been extracted from other properties through and by means of workings on the demised premises, said Lessee shall pay to the said Lessor as a usage charge 6¼% of the net mill, smelter or sampler returns of all such ores. Net returns as herein used shall mean the amount remaining from the gross values after deducting the actual cost of transportation and treatment charges, it being understood that Lessee shall not make or deduct any charges as against the Lessor for milling any ores in the present mill or any mill which may be constructed on the demised premises; and it is further agreed that for the purpose of this agreement the cost of transportation from the mill or mine to a point of railroad loading shall not exceed three dollars ($3.00) per ton on ores or concentrates, and that if transportation be made in any manner other than by railroad from such railroad loading point the cost shall not exceed the railroad rate plus cost of delivery to the railroad shipping point, as herein provided.

"Lessee further agrees that in the event the total amount paid to Lessor as royalties, tunnel and mill usage charges and the payments in lieu of the commencement of the mill as hereinabove provided, shall not equal the sum of fifteen thousand dollars ($15,000.00) on or before ten (10) months after the date hereof and a like sum on or before the expiration of each of the five consecutive six (6) months periods thereafter, and the sum of ten thousand dollars ($10,000.00) on or before the expiration of the four months period ending November 22, 1937, the Lessee shall pay to the Lessor the difference in cash between the total amount of said royalties and other pay-

ments theretofore made during each of said periods and the sum hereinabove required to be paid for each period. If, the royalties and other payments made to the Lessee during any of said periods, above defined, shall exceed the sum required to be paid for said period, the excess may be applied upon the next or any succeeding period.

"Eighth: At all times to keep, handle, ship and treat any and all ores and minerals extracted from the demised premises separate and apart from any other ores, minerals or materials which the said Lessee may mine or extract from any other workings or premises which are not a part of the demised premises.

"Ninth: To furnish to said Lessor or its agent or representatives, or any of them, full, true and accurate information, either written or oral, in response to any request with respect to the workings or the mineral or ore bodies within the demised premises or any part thereof, and to permit said Lessor at any reasonable time, on request, to inspect any maps and surveys made by the Lessee of the workings within the demised premises, and by the request in writing of the Lessor, to furnish it with a duplicate or blue print of such maps or surveys.

"Tenth: Prior to permitting any person to engage in any work in or upon the demised premises, or in connection with the operation of the same, the said Lessee agrees to take out and at all times during the term hereof to carry and keep in force such insurance under and pursuant to the Colorado Workmen's Compensation laws which are now in force or which may hereafter be enacted as will fully insure, protect and cover the said Lessee's liability as an employer, and also any and all liability imposed by law on Lessor, with respect to any and all persons in any manner employed by said Lessee, or under said Lessee, in, upon or about the demised premises, or in connection with the operation thereof, or permitted or authorized by said Lessee to work thereon, including sublessees, contractors and their employees, and prior to permitting any person to do any work within or upon the

demised premises, said Lessee agrees to make and at all times during the term hereof to maintain a premium deposit with its liability insurer sufficient to guarantee the keeping in force of full liability insurance under said compensation laws. And the said Lessee agrees that he will furnish the said Lessor with the name and address of his liability insurer and with proof that it is carrying and maintaining such compensation insurance, and the said Lessee further agrees to assume all responsibility for and to promptly and at its own expense pay or defend any and all claims arising out of accidents or injuries to or the death of any and all persons while in any manner employed by the said Lessee in or upon the demised premises, or in connection with the operation of the same, or permitted or authorized to work thereon by Lessee, or while in or upon the demised premises by permission of, or at the request, direction or invitation of the said Lessee. And the said Lessee further agrees that he will at all times fully indemnify and save the said Lessor harmless from and against any and all such claims and any and all expense and costs which may arise therefrom.

"Eleventh: It is agreed that nothing herein contained shall authorize any employee of the Lessee, or any person or persons, to charge the Lessor for injury to, or death of any employee, or to authorize the Lessee, or any person dealing through, with or under said Lessee, to charge the demised premises or the interest or estate of the Lessor therein, or this lease, with any mechanic's lien or encumbrance of any kind whatsoever; and that said Lessee agrees that it will at all times, post and keep posted in at least three (3) conspicuous places on the demised premises where work is being carried on, notices as follows:

" 'All persons are hereby notified that the property upon which this notice is posted is being operated under a lease from the undersigned owner to Scott Hendricks, as Lessee, and that said owner will not be responsible for any injuries sustained by any person while in the employ of said Lessee, or for any labor performed on, or any skill,

materials, machinery or supplies of any kind furnished to said property, or to said Lessee, * * *.'

"Twelfth: To allow no person or persons not in privity with the parties hereto to take or hold possession of the demised premises or any part thereof under any pretense whatsoever. Lessee shall have the privilege of paying all taxes, assessed against the above described property, or any liens asserted thereto as the result of any obligation or debt of any nature whatsoever of the Lessor, in case such payment shall be necessary to protect Lessee's interest in said premises, and Lessee may deduct the amount of any such payment from any sum then or thereafter due from the Lessee to the Lessor hereunder; or may have the same deducted and paid to the Lessee by the National State Bank of Boulder from any royalties in his possession payable to the Lessor. The Lessee further agrees that he will at all times during the life of this lease take out and cause fire insurance to be written and carried against and to cover the buildings, structures, improvements and machinery now being on said demised premises at the Lessee's sole expense for the sum of Forty Thousand Dollars ($40,000.00) against loss or destruction by fire from any cause in some standard fire insurance company or companies satisfactory to the said Lessor. It is understood, however, that if it is not possible to obtain Forty Thousand Dollars ($40,000.00) in fire insurance on said property, the Lessee shall carry the maximum amount obtainable in fire insurance, provided, however, said maximum is not in excess of Forty Thousand Dollars ($40,000.00) and in the event of the placing upon said premises of additional buildings, structures or machinery, the amount of said insurance shall be increased so as to adequately protect said additions. All policies of insurance shall be made and insurance carried in the name of the Lessor with loss payable clause in favor of Lessee as his interest may appear as soon as issued and delivered to the Lessor and retained in its possession. In the event that during the time this lease shall be in

force and effect, the demised premises or any part thereof shall be damaged or destroyed by fire, the Lessee, his successors and assigns shall have the option within sixty days from the date of such damage or destruction to elect to do as follows, to-wit:

"(1) To immediately after said election diligently restore or reconstruct at his own expense such damaged or destroyed portions to the extent and value as theretofore, and when so reconstructed, to apply the amount of such insurance toward the expense of reconstruction; or

"(2) To allow Lessor to make such construction as may be agreed upon in lieu of the damaged or destroyed portions to the extent that the same may be done from the amount of insurance paid on such policies; or

"(3) To pay the option price in full, and use said insurance fund or so much thereof as shall be necessary, as a part of said payment.

"If the Lessee, his successors or assigns, shall fail to elect as aforesaid within said period of sixty days, then this lease shall be terminated and of no further force and effect and said amount of insurance shall be retained by Lessor, its successors and assigns.

"Thirteenth: Lessor agrees to deliver immediate possession of said property subject to existing leases now in operation on segregated portions thereof and undertakes to deliver full and complete possession of the entire property within forty days from the date of this instrument, except that block of ground covered by a lease granted to Joe Rydbom and William Nolan which expires January 2, 1935. Lessee hereunder shall be subrogated to all rights of the Lessor to all the said existing leases on segregated blocks of said property upon the execution of this lease and shall thereafter be entitled to receive all royalties and benefits of said leases.

"It is further hereby agreed between the parties hereto as follows, to-wit:

"(a) That all payments to be made hereunder and the entire net returns due to Lessor, by reason of ores

mined by the Lessee on the demised premises, shall be paid by the purchaser of said ores direct to The National State Bank of Boulder, Colorado, and that said bank shall thereupon pay to the Lessor the amount due it under the terms of this agreement. The filing of a notice of this agreement with the purchaser of such ores shall constitute authority and direction to such purchaser to make such payments at said bank, and each payment by the purchaser of ores hereunder shall be accompanied by triplicate settlement sheets showing the total amount paid for such ores, one to be retained by the said bank, one to be delivered to the Lessor and one to be delivered to the Lessee.

"(b) The purchaser or purchasers of all ores or concentrates mined or extracted from the ground or premises outside the demised premises and subject to the transportation and/or milling charge of $6\frac{1}{4}\%$ as herein provided, shall deduct for the account of the Lessor $6\frac{1}{4}\%$ of the net returns on all such ores and remit the same direct to the National State Bank of Boulder, Colorado, with triplicate settlement sheets showing the gross returns from such ores or concentrates, and said Bank shall pay the sum so remitted direct to the Lessor, said settlement sheets to be distributed one to the Lessee, one to the Lessor, and one to be retained by said Bank.

"(c) That said Lessor shall have, and hereby reserves the right, through its officers, agents and representatives, or any of them, at any and all times, to enter and visit all parts of the demised premises and the workings thereof, for the purpose of inspection, and to make surveys, and shall have the right, upon 24 hours notice of intention so to do, to take assay samples for the purpose of checking the location of ores, to determine whether or not ores are being extracted from the demised premises; and the Lessee may participate jointly in the taking of said samples if he so desires, it being understood that all information that is thereby obtained shall be kept confidential by parties hereto to the best of their respective

ability, and shall not be used otherwise than for the purpose herein expressed.

"(d) It is agreed that the Lessee may make one assignment of this lease, and thereafter no other and further assignment or transfer of said lease or any interest therein shall be made without the written consent of Lessor first thereto had and obtained; and it is agreed that any involuntary assignment or transfer of this lease or interest therein, by operation or process of law, shall render this lease void and of no further effect. Subject to the limitation herein expressed, this lease and all its terms, covenants and conditions shall be binding upon and extend to the successors and assigns of the respective parties hereto.

"(e) The Lessee shall have the right to sub-lease any portion of the leased premises, said sub-lessees, however, operating under and subject to all the covenants and conditions of this lease.

"(f) That no timber or trees shall be cut upon the demised premises or any part thereof except for underground mining use within the leased property.

"(g) That time is of the essence of this agreement, in each and every particular; and in case the Lessee shall fail to keep and perform any covenant, agreement or condition herein expressed, to be by said Lessee kept and performed hereunder, then and in such event, the term of this lease shall, at the option of the Lessor, expire and be at an end, provided, however, that the Lessor shall give the Lessee thirty days written notice by registered mail at his address in care of Albert G. Craig, First National Bank Building, Denver, Colorado, or at any other address within the United States given in writing by Lessee to Lessor, of Lessor's intention to end said Lease, during the period of thirty days, which shall be the thirty days immediately following the posting of said notice, the Lessee may correct, if possible, such violation; and it being further understood and agreed that in the event of the failure of Lessee to keep workmen's compensation

insurance, as herein provided, in full force and effect, it shall only be necessary for Lessor to deliver written notice to said Craig or such other person at Denver, Colorado, as Lessee may designate, of such failure and of its intention to cancel this lease; and unless proper, full and complete compensation insurance is forthwith restored within twenty-four hours after delivery of said notice, not including a Sunday or legal holiday, this lease shall be cancelled. Immediately upon receipt of such notice, all possible shifts of work shall stop until said insurance is reinstated.

"Provided, however, these rights of cancellation shall not exist if any such default be due to strike, riot, act of God, fire or other cause beyond the control of the Lessee.

"The failure to give notice of any violation hereunder shall not be a waiver of the right to give further notice in event of another breach or violation of the terms hereof.

"The Lessee agrees that at the expiration of the term of this lease, or its sooner termination under the provisions hereof, the demised premises and each and every part and parcel thereof, together with all improvements placed thereon by the Lessee, shall revert to and become forfeited to said Lessor, and thereupon the Lessor, with or without process of law, may enter upon and take possession of the demised premises with appurtenances and improvements thereon, and every part thereof, and dispossess the said Lessee and any and all persons found in occupation of the same, and in such event said Lessee shall surrender, yield up and deliver to said Lessor, its successors or assigns, the quiet and peaceful possession and enjoyment of the demised premises, together with buildings, improvements, machinery and equipment (except hand tools and personal property) thereon, and all dumps, ores and other minerals detached or broken from said premises, but still remaining thereon, without demand or further notice, and if the said Lessee shall fail so to do, the said Lessee may forthwith be evicted from

said premises forcibly or otherwise, with or without process of law.

"It is mutually understood and agreed by the parties hereto that for the purpose of this agreement the reasonable minimum rental value of the tunnel, mill and other property leased hereunder is the royalty and other payments provided herein and all royalty, and usage charges fixed herein or any part thereof paid as royalties or percentage on ore mined, or treated by usage of the mill, tunnel and other property as provided herein, are the result of the depletion of the demised property and the use and operation of the tunnel, mill and other property. That all moneys expended by the Lessee in the repair of said property or the revamping and equipment of said mill are necessary to operation of the same under the terms of this lease and constitute a further consideration for the execution of this lease by Lessor and such expenditures are considered as not a part of any rentals to be paid hereunder or as constituting any equitable interest in the Lessee in or to any of said property except Lessee's use and enjoyment during the term of this lease.

"It is further agreed that the continued operation of said property during the term of this lease and the full payment of all rentals and royalties for the full term and period of this lease or the payment of the full sum of eighty-five thousand dollars ($85,000.00) shall entitle the Lessee to the full right and use and enjoyment of the demised premises thereafter in the same manner as though purchased outright at the beginning of the term of this lease and in such event Lessor agrees to convey the same by warranty deed and furnish abstract of title showing merchantable title in Lessor to the date thereof.

### Option.

"This agreement further witnesseth: That for and in consideration of the sum of one dollar ($1.00) by the said Lessee to the said Lessor in hand paid, receipt of which is hereby confessed and likewise in consideration of the

acceptance of this lease and the expenditures to be made thereunder, and the well and faithful keeping of the covenants, agreements and conditions thereof, the said Lessee shall have the right at his option to purchase the herein demised premises and property and receive a warranty deed conveying good merchantable title to the same free and clear of all encumbrances, provided he shall first pay to the said Lessor the full sum of eighty-five thousand dollars ($85,000.00) at any time on or before the 22nd day of November, 1937, while this lease shall be in full force and effect. Time is and shall be of the essence of Lessee's right and option to purchase said premises, and it is expressly agreed that this option and said lease shall constitute one entire and inseparable contract, and that the forfeiture, surrender or termination of said lease for any cause shall render Lessee's option to purchase void. If the said Lessee shall exercise his said option prior to the forfeiture, surrender, termination or expiration of said lease, then and in such event, and in such event only, the payments received by the said Lessor under said lease as royalties, as tunnel and mill usage charges or percentages, and as payment for delay in commencing the operation of said mill, shall be considered as a credit on said option price and shall reduce the same accordingly. If, however, the said Lessee shall fail to exercise his said option prior to the forfeiture, surrender, termination or expiration of said lease, then and in such event any and all the aforesaid payments received under said lease by said Lessor shall be retained by the said Lessor as royalties and rentals for the occupation, use and enjoyment of the demised premises by said Lessee and shall not be considered in any respect as a credit or payment on said option price, and neither the royalties or said other payments received by the said Lessor from the said Lessee under said lease, nor any improvements erected or placed in or upon said demised premises, nor work or expenditures of any kind done or made by the said Lessee within or upon said demised premises under said lease, shall

in any respect be considered, held or claimed as giving the said Lessee any right, title, interest or claim, equitable or otherwise, in the said demised premises or any part thereof. It is agreed that the said Lessee shall exercise his said option by giving written notice to the said Lessor at the National State Bank of Boulder, Colorado, of his intention so to do accompanied by the payment or tender to the said Lessor of the entire sum, if any, which may then be payable on said option price in order to complete the same.

"In the event the Lessee shall pay the full sum of eighty-five thousand dollars ($85,000.00) pursuant to this lease and option then and in that event only shall Lessee be entitled to take and claim the undivided one-eighth interest in certain of said property, known as the Lake interest, under the assignment of the equitable right and claim of John G. Clark thereto, and in which event the assignment made by John G. Clark shall become effective and included with the property covered by this option and the option price fixed herein.

"The Lessee shall have the right at any time after this lease and option becomes effective to make request in writing for the deposit by Lessor in the bank herein designated to distribute and receive proceeds of ore shipments within thirty days after date of such request of a warranty deed covering the said leased property, together with an abstract of title certified to the date of such deposit showing merchantable title except as to the extra-lateral rights in the Matters Group with appropriate instructions authorizing the delivery of said deed and abstract to Lessee, or his assigns, upon full payment of the sum of eighty-five thousand dollars ($85,000.00) for said leased premises, as hereinabove set forth, or the immediate return of said deed and abstract to the said Lessor upon default in the payment of said price.

"The said Lessor hereby consents to one assignment of this option by Lessee. Thereafter no further or additional assignment of the same shall be made without the

consent in writing of said Lessor first thereto had and obtained. Subject to said last mentioned limitation this option and lease agreement and all of its terms, provisions and conditions shall extend to, bind and inure to the benefit of the successors and assigns of the respective parties hereto.

"Lessee further agrees to accept the assignment of the equitable right and claim of John G. Clark, known as the Lake interest, in the event it shall become entitled to the same under the provisions hereof, or in other contracts, with respect thereto, contained, free of any guaranty or warranty on the part of the said Tungsten Production Company."

(Signatures and acknowledgment.)

By the terms of this document plaintiff in error was required to commence work within thirty days after the execution of the contract, and in compliance with the laws, state and federal, as well as in mine fashion, to do certain things in relation to the property or to make certain payments, or both, on or before the expiration of thirty-eight months. Briefly, work and mining of the premises was to proceed steadily and continuously during the term, and until the commencement of operation of a certain mill on the property, which plaintiff in error was to reconstruct and revamp to capacity to treat not less than one thousand five hundred tons of ore per month; the work was to consist of not less than one hundred fifty underground shifts in each month, and after such reconstruction and revamping, three hundred shifts per month; but it was provided that if the mill was not ready to operate within one hundred twenty days, by the payment of $2,500 in cash on or before the expiration of said period, Lessee should have an additional thirty days in which to place the mill in order pursuant to the contract. And by payment of a like sum within such extended period, and the same within each succeeding thirty-day period, in royalties or cash, or both, provided said payments should equal

$15,000 within ten months from the date of the instrument, and a like sum on or before the expiration of each of the five consecutive six-months periods thereafter, and the sum of $10,000 on or before the expiration of the four-months period ending November 22, 1937, failure to reconstruct and revamp the mill would not constitute default. Provision also was made to the effect that sums paid during any of said periods in excess of the requirement for that period should be applied to the next or any succeeding period. If the payments were made as provided in the contract, defendant in error was to make conveyance of the property. In the event of failure to comply with the terms of the lease, it was subject to forfeiture upon thirty days' notice by the Lessor, within which period plaintiff in error was privileged to remedy the default.

It appears that in addition to the initial payment, $15,000, formally acknowledged, it is conceded that plaintiff in error made cash payments as follows: January 22, 1935, $2,500; February 22, 1935, $2,500; March 22, 1935, $2,500; April 22, 1935, $2,500; May 21, 1935, $2,500; June 20, 1935, $2,500; July 20, 1935, $2,500; August 20, 1935, $2,500; September 20, 1935, $2,500; October 21, 1935, $2,500; November 20, 1935, $2,500; December 19, 1935, $2,500 (this payment consisted of $1,266.85 in cash and $1,233.15 on account of taxes properly chargeable to defendant in error); January 21, 1936, $2,500, the aggregate of the further payments being $32,500, or a grand total of $47,500 paid in cash. Plaintiff in error also paid $5,648.62 in royalties, which, added to the payments already mentioned, made a total of $53,148.62 paid toward the discharge of the $100,000 mentioned in the contract. Otherwise stated, at the time of the cancellation notice, based on defendant in error's claim that plaintiff in error had failed to pay one-half of the payment due—$7,500—July 22, 1936, the entire unpaid balance, or less than one-half of the full requirement, was $46,851.38.

Although the exact date when the mill was recon-

structed and revamped does not clearly appear, it seems that the work was accomplished some time before the notice of default to which we have just referred was served. In reconstructing and revamping the mill, plaintiff in error equipped it with valuable and costly new and modern machinery, and made many other valuable, expensive, and lasting improvements on the property, fully itemized and not seriously questioned, all at an aggregate expense to plaintiff in error of about $95,000. After the completion of the mill plaintiff in error mined approximately eight thousand two hundred tons of ore of net smelter value of $27,777.21. In doing so, however, plaintiff in error expended an additional sum of about $75,000. Summarized, it appears that between the date of the contract, September 22, 1934, and July 23, 1936, when notice of cancellation was served, plaintiff in error had paid defendant in error and expended in lasting improvements, rehabilitation, machinery and in mining in relation to the property, a sum in excess of $220,000, against which it had enjoyed income from the mine only in the sum of about $28,000, or in the short time appearing its net expenditures in the premises had been about $190,000. In its findings the trial court emphasized, and in its briefs here defendant in error mentions, other claimed defaults; but only as to failure to pay the balance of the payment due July 22, 1936, $7,500, was notice given as provided in the contract. The further lapses of which complaint is made, if any, were of a time when defendant in error was proceeding to enforce full forfeiture, and when plaintiff in error was endeavoring to foil that which immediately would despoil it of the large sums it had paid and expended, and seeking the right to enjoy reasonable time within which to pay the whole sum, thereby to become entitled to a conveyance of the property.

██ ██ Viewing the contract in its entirety, a fair deduction is that sale of the property was the principal contemplation of the parties. Defendant in error's notice of default and demand for possession is consistent with

that construction. Incidents developed at trial strengthen such view. Indeed, the learned trial judge, although disclaiming the power to proceed on that premise, intimated as much in his summation at the close of the argument before him. The president of defendant in error testified that the man who brought about the contract was to be paid a commission "if he would sell the property," and that out of the first payment of $15,000 he was paid the sum of $5,000. "Equity," we have said, "has to do with the substance and reality of a transaction—not the form and appearance which it may be made to assume. The case of *Blackstock v. Robertson,* 42 Colo. 472, conclusively shows that it is the real intention of the parties, and the true nature of the transaction that concerns equity, and if the true nature is that of security, the transaction will be given that effect no matter how many papers may have been executed that cover up the real purpose, and give to the transaction an appearance other than the true one. As our Court of Appeals has said, quoting from Story, 'If a transaction resolve itself into a security, whatever may be its form and whatever name the parties may choose to give it, it is in effect a mortgage.' " *Borcherdt v. Favor,* 16 Colo. App. 406, 66 Pac. 251; *Reitze v. Humphreys,* 53 Colo. 177, 125 Pac. 518.

What we have said concerning money expended by plaintiff in error on and in relation to the property involved other than that which by the terms of the contract was to be, and concededly has been, credited on the discharge of the immediate money obligation to defendant in error, only has to do with the claim of plaintiff in error as to its good faith, and is emphasized because of the mistaken contention of defendant in error that plaintiff in error claims direct credit on account of such expenditures.

It appears that the large sums paid to defendant in error, and the amounts expended in relation to the property involved, largely came from one stockholder. The serious illness of this stockholder early in 1936—culminating in his death in July of that year—marked the

only time when there was delay and finally failure to make payment in accordance with the terms of the contract. The intervention mentioned does not, of course, excuse plaintiff in error in the sense that payment in full must precede its right to have conveyance of the property, nor is it so contended by plaintiff in error. It is only mentioned because we are disposed to the view that the passing of the stockholder who had made the vast contributions appearing, is a circumstance properly to be considered in relation to plaintiff in error's status in equity. We think notice should be taken of the difficulty of raising from new sources the balance or more than $46,000, besides interest, required to discharge the obligation in full, and particularly where, as here, the party entitled to the money is formally contending that payment would be unavailing in any event.

██ The contract, while containing provisions requiring plaintiff to perform some very definite things, is tempered throughout with provisions which enable the bounden therein to escape such requirements by the payment of money. Indeed, failure to pay money, as we have seen, was the sole burden of defendant in error's notice of cancellation and demand for possession. Therefore, since, as we think, payment of money by plaintiff in error, and the receipt thereof by defendant in error, was the motivating purpose of the contract, the situation comes within the equitable rule that where a vendee has substantially performed, the contract simply operates as an instrument of security as to the balance to be paid. In such situation there is breathed into what may be termed the severe legal language of a contract, "an equity superior to its terms." It follows that one seeking at law to realize on such a contract, may, if his selection of remedy be challenged through interposition of an answer in equity, as here, find himself remitted to an equitable remedy. *Fairview M. Corp. v. American M. & S. Co.*, 86 Colo. 77, 278 Pac. 800. See, also, *Pope v. Parker,* 84 Colo. 535, 271 Pac. 1118; *Taylor v. Briggs,* 99 Colo. 89, 60 P. (2d) 1081, and

authorities reviewed in those opinions; Denison, Code Pleading in Colorado, section 710.

■ We have not overlooked the provisions of the contract which state that time is of the essence thereof, nor that some of the authorities which have persuaded us to our decision did not contain a formal statement to that effect. The expression "time is of the essence" is not more controlling than are definite provisions of a contract which mean that time is of the essence.

*Fairview M. Corp. v. American M. & S. Co., supra,* and which otherwise, as we think, is an authority for the view we entertain in relation to this controversy, is thought by defendant in error to be distinguishable because it does not contain the expression "time is of the essence"; but we do not regard it as lacking in that which is equivalent to such an expression. We think time there was of essential importance, but the decision turned upon the fact that the one seeking to invoke equity, as here, had made substantial payments, sufficient at least to establish its good faith and to indicate its purpose to fulfill every exaction. Besides, "The fact that the contract expressly states that time is of the essence is not conclusive. Other provisions of the contract may be so inconsistent with this as to lead to the conclusion that time is not essential." 3 Williston on Contracts (Rev. Ed.), p. 2388, §852, Note 8. See, also, *In re Boldt Floral Co.* (C. C. A. Tenth Circuit), 37 F. (2d) 499.

■ Considering the absence of knowledge on the part of defendant in error that plaintiff in error would plead the contract and what it had done pursuant thereto, and, predicated thereon, seek to have the contract and the extent of its performance construed in equity, defendant in error no doubt was justified in the first instance in instituting action in ejectment. On the incoming of plaintiff in error's answer, however, wherein it showed the large payments made directly to defendant in error as well as still larger sums expended in and about the property, not gainsaid by defendant in error, and whereby defendant in

error's right to maintain ejectment was challenged in equity, it would have exercised wisdom, we think, had it then either dismissed its action and instituted a suit in equity, or joined plaintiff in error in its prayer to have the controversy determined on that theory. Proceeding so, defendant in error could have realized its every reasonable right within a time long since expired. Instead, defendant in error persisted, and continues to urge, that no equities exist in behalf of plaintiff in error, and that it was entitled to insist upon legal forfeiture of rights which plaintiff in error sought to predicate upon the good faith manifested by its works and payments. Defendant in error's complaint on the score of delay is properly attributable to its resolve to pit its claim of forfeiture against the uncertainties of litigation, for, if judicial favor attended, it stood to reap richly, while an unfavorable determination, at worst, only postponed the time when it would be paid its entire due, with interest, or become possessed of its property, greatly enhanced in value. No judge, himself a lawyer, would venture to criticize defendant in error's effort to the end indicated, nor will any lawyer, as we think, fail to appreciate our conclusion that the circumstances here warrant us in relegating defendant in error to a remedy through which justice may be meted to both parties.

█ Defendant in error complains that plaintiff in error has not tendered, nor does it allege its ability and readiness to pay, the balance which on its own theory would be required. The answer is that the parties are in a controversy as to the construction of the contract, one saying that it is as a vise in its terms, while the other contends that considered in the light of what has been done in compliance therewith, it is plastic and subject to equitable consideration and treatment. In short, to determine the case we must construe that which is the basis of the disagreement between the parties, and their relation thereto. The circumstances here considered, we think the rule "that requires the plaintiff to tender the amount due

or allege his ability and readiness to pay it, does not apply to a case which has for its object only the construction of a contract and the relation of the parties," as stated in *Reitze v. Humphreys, supra,* is applicable.

Defendant in error urges that plaintiff in error, even though there were equities of the nature claimed by the latter in the matter of time, has enjoyed so much time that it is without the pale of the rule. The trial court predicated its conclusion in part upon that theory. The authority cited in support of the contention is *American Mortgage Co. v. Logan,* 90 Colo. 157, 7 P. (2d) 953. Some language there, if the distinction between that case and the one here were not kept in mind, might well be said to support the view of defendant in error. The difference between the cases is that the party there seeking to enjoy equitable relief, obtained extension after extension from the other party, and it was only after many, many such extensions that forfeiture was sought. Those facts in mind, the court very properly observed there that "in the present case it had all the delay that equity would require." Here there was not even one day's delay. The first default by plaintiff in error, and, so far as formal notice is concerned, the only one, occurred July 22, 1936, and the next day notice of cancellation and demand for possession was served. Another distinction between the Logan case and this is that there, as Mr. Justice Butler emphasized, the party in default "is not here seeking an opportunity to pay. Its position is that it is not required to pay, and that it does not intend, or even wish, to pay." Here, plaintiff in error wishes to pay, and only seeks reasonable time, equitably fixed, within which to make payment of the entire balance, plus legal interest.

Defendant in error also complains of a proceeding in the federal court instituted by plaintiff in error under its conception that possibly it could obtain relief under the provision of section 77-B of the Federal Bankruptcy Act, which finally was denied, and the delay that proceeding worked. Perhaps the application in bankruptcy did oper-

ate to retard defendant in error as to its contemplated action at law for cancellation and forfeiture, but it frankly conceded that it was not precluded from proceeding in equity at its pleasure. We cannot think the complaint on that score is reasonably based.

In the Fairview case, supra, where result similar to our conclusion here was reached, we permitted defendant in error to reframe its complaint and proceed as in foreclosure, failing which it was to suffer dismissal of its ejectment action. A like order would serve here; but since the sum required to entitle plaintiff in error to conveyance, $46,851.38, plus interest from August 23, 1936, the effective date of defendant in error's demand for possession, is of easy ascertainment, a simpler order, as well as one within equitable cognizance, as we conceive, would be to allow defendant in error to elect to have the court adjudge that from the date of its order entered pursuant hereto, plaintiff in error may have six months within which to pay into the registry of the district court, for the benefit of defendant in error, a sum conforming to the computation suggested. We are moved to this somewhat different order for the further reason that we think it would be inequitable, all the circumstances considered, to require defendant in error to employ the time which reframing of its complaint and protracted further proceedings would entail. It is likely that defendant in error will make its election at an early date, as would seem to be in its interest, but if it does not make such election within thirty days from the time remittitur is issued, the action shall be dismissed, at its costs. If plaintiff in error shall make payment within the six-months period, it is to be credited with its costs, incurred here and below, to be taxed; but if such payment is not made all costs shall be taxed against plaintiff in error.

We approve the order entered by the trial court requiring plaintiff in error to guard and safeguard the property pending the litigation, and we direct that that order

504

be continued during the time fixed for plaintiff in error to make payment.

Let the judgment be reversed, that appropriate orders may be entered by the trial court.

MR. JUSTICE FRANCIS E. BOUCK dissents.

MR. JUSTICE OTTO BOCK not participating.

The following dissenting opinion was filed August 19, 1939.

MR. JUSTICE FRANCIS E. BOUCK dissenting.

I respectfully dissent from the opinion of the court.

## 1. *The Contract.*

The case at bar involves a document containing a lease and an option, each of which is as complete in itself as if it were a separate instrument. Except as to formal parts. and the description of the mining property demised, the entire document is quoted in the opinion of the court. I ask the reader to refer to it in connection with this dissent.

As one reads the lease it is not unlike the typical Colorado mining lease with the usual provisions 'as to the amount and character of work and the payment of rental in the shape of royalties. The lease also provides for the payment of certain specific sums at stated times, in default of which payment, as in default of the performance of any other covenants, the lease may be terminated or "forfeited" by serving a prescribed notice. The evidence shows without contradiction that nearly one half of the sum of $15,000, payable during the period ending on July 22, 1936, was not then paid or tendered. Notice was promptly served on the lessee in the exact manner required by the lease, *demanding that the delinquency be made up within the next thirty days,* which was obviously deemed by the parties to be a reasonable period to remove the delinquency. No mine operator or practical miner would have any difficulty in understanding, or recognizing as a lawful fact, that failure to pay within the period lim-

ited would actually terminate the lease at the end of the thirty days. There is nothing extraordinary in the provision whereby all the royalties and all the other required payments received by the lessor before termination of the lease were to be and remain the property of the lessor, or that the lease might be terminated for not paying a required sum at the specified time. Such a provision would certainly not be considered as vesting an *equitable interest* in the lessee even to the extent of any payments made thereunder.

The option is wholly distinct. Its provisions are in a common form of mining opinion (compare Morrison's Mining Rights, 16th ed., page 352); in other words, they offer a unilateral contract which *may become* a binding *contract to sell and purchase land* by compliance with the conditions of the option. Those conditions are: "The said Lessee shall have the right at his option to purchase the herein demised premises and property and receive a warranty deed conveying good merchantable title to the same free and clear of all encumbrances, *provided he shall first pay* to the said Lessor the full sum of *eighty-five thousand dollars* ($85,000.00) at any time on or before the 22nd day of November, 1937, *while this lease shall be in full force and effect.* Time is and shall be of the *essence of Lessee's right and option to purchase said premises,* and it is expressly agreed that this option and said lease shall constitute one entire and inseparable contract, and that the forfeiture, surrender or *termination of said lease for any cause shall render Lessee's option to purchase void.* [Compare Morrison, op. cit., page 346.] If the said Lessee shall *exercise his said option prior to* the forfeiture, surrender, *termination* or expiration of said lease, *then and in such event, and in such event only,* the payments received by the said Lessor under said lease as royalties, as tunnel and mill usage charges or percentages, and as payment for delay in commencing the operation of said mill, shall be considered as a credit on said option price and shall reduce the same accordingly. *If, however, the*

*said Lessee shall fail to exercise his said option prior to the forfeiture, surrender, termination or expiration of said lease,* then and in such event any and all the aforesaid *payments received under said lease by said Lessor shall be retained* by the said Lessor *as royalties and rentals* for the occupation, use and enjoyment of the demised premises by said Lessee and *shall not be considered in any respect as a credit or payment on said option price,* and *neither the royalties or said other payments received* by the said Lessor from the said Lessee under said lease, *nor any improvements* erected or placed in or upon said demised premises, *nor work or expenditures* of any kind done or made by the said Lessee within or upon said demised premises under said lease, *shall in any respect be considered, held or claimed as giving the said Lessee any right, title, interest or claim, equitable or otherwise,* in the said demised premises or any part thereof.'' (Italics are mine.)

Moreover the option further provides: ''It is agreed that the said *Lessee shall exercise his said option by giving written notice* to the said Lessor at the National State Bank of Boulder, Colorado, *of his intention so to do accompanied by the payment or tender to the said Lessor of the entire sum, if any, which may then be payable on said option price* in order to complete the same.'' (Italics are mine.)

Not only was there no payment or tender of the delinquent sum within the thirty days or at any time, and not only does no exercise of the option by notice of intention or otherwise appear, but in its pleadings the plaintiff in error lessee has not even made the requisite offer or stated its willingness to pay, as equity pleading requires, though the term of the lease has long since expired. This minimum showing of willingness to pay and to do equity is entirely lacking. In such circumstances equity would not force a foreclosure proceeding even if there were (as there is not here) an actual contract of sale and purchase, which the plaintiff in error mistakenly claims to exist.

Before discussing the law applicable to the present situation, I desire to correct the doubtless inadvertent misstatement of fact, made in the answer and adopted by the court's opinion, that the option price was $100,000. It was $85,000 (fol. 84, 90). $15,000 was paid as *part consideration for the lease,* regardless of whether the option would be taken up or not (fol. 40). Moreover, I need hardly mention that the expenses of working the lease referred to in considerable detail by the court's opinion, though there are denials and the lessee has produced no proof, have no more bearing on the rights and liabilities of the respective parties than in the case of any other mining lease.

## 2. *The Law.*

I join with the majority of the court in high regard for Pomeroy's and Williston's texts. It is with due deference that I shall point out what in the light of the particular fact situation before us seem to me misapplications of statements in these authorities. The court's opinion apparently ignores the sharp distinction to be drawn between a binding *contract to sell and purchase* and a mere *option* to purchase. The latter is what we are dealing with in the case at bar. It is essentially an *offer* which must be accepted *according to its terms* before it becomes a contract. If not so accepted, the offer confers no contractual rights whatever. An optionee not accepting the offer *as made* does not acquire any such rights. The acceptance, as already shown above, must be accomplished "while this lease shall be in full force and effect." The plaintiff in error's only contentions to overcome the effectiveness of the notice terminating the lease are that *time was not of the essence of the contract,* and that there could be no *"forfeiture,"* and that the lessee had an *equitable interest* in the property which continues indefinitely regardless of utter failure to comply with the requirements of the lease expressly adopted as conditions of the option itself. To these contentions I shall revert when I come to compare the lease and option in a case cited and

relied upon in the court's opinion *(Fairview M. Corp. v. American M. & S. Co.,* 86 Colo. 77, 278 Pac. 800, hereafter referred to in this dissenting opinion simply as the Fairview case) with the document in the case at bar. Before doing so I shall refer to the distinction already mentioned which I believe the court's opinion has overlooked, namely, the radical difference between the *nature* of the ultimate contract before us in the Fairview case and the *nature* of the contract now before us.

In passing we note that the court's opinion emphasizes one single sentence appearing in a lengthy footnote (which also contains a multitude of recognized authorities on matters not bearing upon the subject matter of the sentence) in 3 Williston on Contracts (Rev. Ed.), page 2388, section 852 (note 8). That sentence says that an express stipulation making time of the essence was held in *Phillis v. Gross,* 32 S. D. 438, 143 N. W. 373, to be *properly disregarded when inconsistent with other parts of the contract.* This, however, involved a *contract of sale and purchase,* not a contract of *option.* For the latter kind of case we must go on to the next section (853, op. cit.), where Williston says:

"§853. Time is of the essence in equity in a contract of option. In a contract of option the party giving the option protects himself only by a condition. There is no obligation on the other side to perform. The question here, therefore, is not one of condition implied in law but of an express condition which must be strictly performed in order to hold the option-giver, the promisor, liable. Therefore, 'whether the question arises either at law or in equity it is settled that time is of the essence of an option.' This is just as true of options embodied in other contracts as it is of the pure offer-option. * * * Where an option requires notice of intention to exercise it, as distinguished from acceptance of an offer-option, the courts generally require such notice to be received by the party to be notified in order to be effective."

Similarly the opinion of this court in the Fairview case

cites approvingly 5 Pomeroy, Equity Jurisprudence (2nd Ed.), section 2238. This also is a discussion of principles applying to a *contract of sale and purchase*. Those principles were properly applied in that case when this court found that the instrument there involved, *in conjunction with certain other documents*, was a *contract of sale and purchase*. On the other hand, the principles applying to *options* to purchase are found in the same work at section 2229 as follows:

"2229. (§807.) Default in Option to Purchase—No Relief. It has at times been suggested that relief for slight failure where there was substantial compliance should be applied to options to purchase land, as where the holder of the option was a day late in exercising the option. But it is clear the rule followed generally by equity is the true one—that there can be no relief against a failure to exercise an option after the day named for its expiration, for an option is no more than an offer to sell which the offerer is bound to keep open during the time set, but which expires with that time, leaving nothing for equity to operate upon. The courts very frequently refuse to give specific performance of an option sought to be exercised after the time has expired on the ground of time being of the essence. Strictly speaking, there is no contract if the election is not made before the expiration of the time, and equity finding no contract to use its discretion upon, cannot be concerned with the element of time, which presupposes an existing contract."

See also section 2233, op. cit., under the heading "When time is of the essence."

Now, it is to be borne in mind that in the Fairview case there was no express or other agreement as to time being of the essence, but that an express agreement to this effect appears in unambiguous and unequivocal language in the contract now before us.

In the more recent work of Pomeroy, Specific Performance of Contracts (3d Edition, published in 1926), section 389, there is a full and able discussion of the principles

which apply when there *is*—as here, but not in the Fairview case—an express stipulation that time *is* of the essence. See also the next following section 390:

"§390. * * * intention of the parties controlling. The early doctrine [that an express provision declaring time to be of the essence may or should be disregarded in equity], as laid down by Lord Thurlow, was doubted by Lord Eldon; and wholly rejected by Lord Kenyon who held the contrary. It is now thoroughly established that the intention of the parties must govern, and if the intention clearly and unequivocally appears from the contract, by means of some express stipulation, that time shall be essential, then the time of completion or of performance, or of complying with the terms, will be regarded as essential in equity as much as at law. No particular form of stipulation is necessary, but any clause will have the effect which clearly and absolutely provides that the contract is to be void, if the fulfillment is not within the prescribed time."

Even if the lease and option here had been silent as to time being of the essence (which is not the case), the natural character of mining property as fluctuating in value and changing with the mere lapse of time would present a situation upon which the trial court could properly find, as it did, that such was the case here. Op. cit., §383. Compare Morrison's Mining Rights, 16th ed., page 355. No better illustration of the fluctuating value of mining property is found than the value fixed by the option in the Fairview case ($150,000) as contrasted with the value fixed by the option before us ($85,000), though the latter included *all the identical property* covered by the Fairview option *and considerably more.*

It should be remembered that by the assignments of error in the present case sole reliance seems placed in the Fairview case. It should also be remembered that in that case (where, as already stated, we found that the contract consisting of the original lease and option, *together with subsequently executed instruments duly acted upon by the*

*parties,* constituted a *contract of sale and purchase)* this composite contract was the entire basis on which the Fairview case (No. 12,321) was fought in this court, as appears on page 13 of the "Abstract of Record" in Volume 1114 of the Supreme Court Library Abstracts and Briefs, where counsel for the lessee are shown to have expressly used the following language in their pleading:

"That *in the original agreement* of October 15, 1924, and all extensions thereof, *there is no forfeiture clause,* and *none was intended* by the parties thereto, and that *time is not made or intended to be made of the essence of the original contract, lease and option and the extensions thereof,* or any of them, and, therefore, all payments made in cash and/or property rights and credits by this defendant are not now, and cannot be forfeited; * * * That said payments, under the terms of said agreement and the law, *constitute and are, in equity, a right and interest belonging to this defendant* in and to the land and premises aforesaid."

The foregoing allegations all stood *admitted* by the demurrer, the sufficiency of the allegations being therefor *the only issue* then before this court. Pleadings *and evidence* in the case at bar are in sharp contradiction to the above.

### Summary.

To summarize:

In the Fairview case this court found that by the execution of subsequent agreements and by the parties' action thereon, *as pleaded* and as admitted by the demurrer, there was a *contract of sale and purchase,* bringing the case within the principles announced in the opinion of the court in that case; *neither* the original lease and option *nor* the subsequent documents expressed the intent to make time of the essence, and the defense demurred to expressly pleaded the *contrary intention;* so likewise as to forfeiture; the documents before us in that case were stated in the answer to have *intended* the transaction to be *merely for security;* as already noted, the whole issue

then before this court was whether the defense was sufficient *as stated* in the answer. Therefore, since this court found that there was a *contract of sale and purchase,* the decision was right. There had been no occasion or opportunity for a trial in the court below on the *questions of fact.* The admissions of the demurrer were there necessarily fatal to the demurring lessor, which did not care to plead over.

In the case at bar, on the other hand, there *has been* a trial, *with findings and judgment entered by the district court on the merits;* the pleadings quote the lease and option in full and these both expressly provide that time is of the essence of the contract (compare fol. 77, 86), likewise that there might be a termination or "forfeiture," and they contain a full statement of the *intention* of the parties; furthermore, the *uncontradicted evidence* shows that before and while preparing the document in question the parties deliberately expressed their *intention to avoid the result in the Fairview case,* this intention being unequivocally declared both orally and in the document itself.

That I have stated the correct principle in relation to cases where the parties have indicated their intention by expressly declaring time to be of the essence is apparent beyond all question from the care with which this court has qualified its opinions in cases falling within the category of the Fairview case. For example:

"The breach in this case is in failure to pay on the day stipulated. This breach is not fatal to the plaintiff's rights *unless time is of the essence of the contract.* There is no *stipulation to that effect* [such as there is in the present case], and the circumstances surrounding the making of the contract, as shown in evidence, do not suggest that the time of payment was considered material by the parties. That being so, it will not be considered material in a case of this kind. In *Byers v. Denver C. R. Co.,* 13 Colo., at page 556 (22 Pac. 953), this Court said:

" 'It is a well settled rule in equity that time is not of the essence of the contract to convey lands, *unless made*

*so by direct contract of the parties or necessary implication.'*

"In *Hoagland v. Murray,* 53 Colo. 50, 123 Pac. 664, this Court quoted with approval the case above cited. This is the general rule:

" 'The intent to make time of the essence must be clearly and unmistakably shown. An *intention* to make time essential *cannot be inferred from the mere appointment of a day* for the delivery of a deed, or the payment of the price.' " *Flora v. Glover,* 69 Colo. 211, 193 Pac. 665. (Italics are mine.)

Obviously this court by the present reversal has not only erroneously made a new contract for the parties but has usurped the trial court's functions as the fact-finding authority, since the record is replete with evidence supporting all of the trial court's conclusions of fact and law. The care with which the case was considered by the trial judge upon both the evidence and the law clearly appears from the "findings, judgment and decree," which are quoted at fol. 970 to 997 of the record herein. I need not call attention to the principle heretofore uniformly held by this court, that this formal pronouncement of the trial court supersedes any of the trial judge's remarks, made during the heat of the trial itself, some of which are referred to in the court's opinion. *Jones v. Boyer,* 68 Colo. 568, 193 Pac. 492; *Soule v. Kunkle,* 71 Colo. 221, 205 Pac. 529; *Davis v. Larson,* 76 Colo. 527, 233 Pac. 160.

One needs only to read the testimony of the witness Russell D. George, the eminent mining expert and former state geologist, to realize that, if the trial judge believed Dr. George's description of the conditions permitted by the lessee to exist in the mine contrary to the terms and provisions of its lease, the trial judge would have been derelict in his judicial duty not to find, as he did, that it would be inequitable not to decide in favor of the lessor. Not only would this testimony tend to prove that the plaintiff in error Rocky Mountain Gold Mines, Inc., has not shown itself ready to "do equity" when it seeks

514

equity, but that it has not come into equity "with clean hands."

Under the principles quoted from Williston and Pomeroy, and in view of the radical differences between the Fairview case and the present one, and according to this court's previous decisions as well as under the general principles of equity, it is therefore apparent that the judgment in the case at bar should have been affirmed.

The foregoing are the principal reasons of my dissent.